**In re PACIFIC GAS AND ELECTRIC COMPANY, a California corporation, Debtor.**

**Pacific Gas and Electric Company, a California corporation, Plaintiff,**

v.

**California Public Utilities Commission, and Loretta M. Lynch, Henry M. Duque, Richard A. Bilas, Carl W. Wood, and Geoffrey F. Brown in their official capacities as Commissioners of the California Public Utilities Commission, Defendants.**

Bankruptcy No. 01–30923–SFM.
Adversary No. 01–3072.

United States Bankruptcy Court, N.D. California.

June 1, 2001.

NIED as moot.

Jerome B. Falk, James L. Lopes, Steven E. Schon, Amy E. Margolin, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, P.C., San Francisco, CA, for plaintiffs.

Gary M. Cohen, California Public Utilities Commission, San Francisco, CA, Alan W. Kornberg, Walter Rieman, Brian S. Hermann, Eric Twiste, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants.

Michael H. Diamond, Paul S. Aronzon, Robert J. Moore, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA, for Official Committee of Unsecured Creditors.

## MEMORANDUM DECISION ON APPLICATION FOR PRELIMINARY INJUNCTION, MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

DENNIS MONTALI, Bankruptcy Judge.

### I. Introduction

In the midst of an unprecedented energy crisis in California, one of the largest public utilities in the country, reportedly hemorrhaging billions of dollars in operating losses, has sought relief under the Bankruptcy Code.[1] Even the most experi-

---

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy

enced bankruptcy observers no doubt considered such a step unthinkable just a few months ago. Now that utility—Pacific Gas and Electric Company ("PG & E")—has called upon this court to prevent enforcement of a decision by its California regulator. PG & E believes—perhaps accurately—that that decision will have immense adverse consequences to it and perhaps to its ability to reorganize successfully in this Chapter 11 case.

Preliminarily the court emphasizes what this adversary proceeding is not about. It is not about a power struggle between a federal bankruptcy court and an agency of the executive branch of California government. Nor is it about second guessing or preempting the wisdom of that agency. It is not about a conflict between federal and state law. Nor is it about setting retail electric rates. Most importantly, it is not about solving PG & E's, or California's, or the country's energy crisis. That is for others to attempt.

What this adversary proceeding is about is determining whether the Congress, the Supreme Court of the United States, and the United States Court of Appeals for the Ninth Circuit have permitted federal law to prevail over state law such that this court may assist the debtor. In other words, did Congress give PG & E the means under the Bankruptcy Code to halt those state proceedings and procedures that may bring about the dire consequences that it predicts? Reduced to its simplest terms, PG & E asks this court to rule that its regulators cannot carry out a portion of their state-created mission; in turn the agency and its members ask the court to determine either that the court lacks the ability even to respond to PG & E's request, or in the alternative, that PG

& E's request be denied so that its relief, if any, will be found in state administrative or judicial proceedings or federal non-bankruptcy courts.

The court has considered PG & E's Preliminary Injunction Application, the defendants' Motion To Dismiss, their Motion For Summary Judgment, all declarations, requests for judicial notice and other papers filed in support of or opposition to the application and motions, the arguments of counsel, the memorandum of the Attorney General of the State of California, as *amicus curiae*, and the oral arguments of all counsel, including counsel for the Official Committee of Unsecured Creditors (the "OCC"), presented at the hearing on May 14, 2001.

For the reasons that follow, the Preliminary Injunction Application will be denied; the Motion To Dismiss will be granted; and the Motion For Summary Judgment will be denied as moot.

## II. *Procedural Background*

On April 6, 2001, PG & E filed its voluntary Chapter 11 petition, and on April 9, 2001, it filed its Complaint For Injunctive Relief. Thereafter, on April 25, 2001, it filed its First Amended Complaint For Injunctive And Declaratory Relief ("First Amended Complaint"). In the First Claim For Relief of the First Amended Complaint, PG & E seeks declaratory relief under 28 U.S.C. § 2201 and 11 U.S.C. § 362(a) that the automatic stay of 11 U.S.C. § 362(a)(1) and (3) applies to the proceedings described below. In the Second Claim For Relief, PG & E seeks a preliminary and permanent injunction staying enforcement of the Ordering Paragraphs described below as "... necessary

Code, 11 U.S.C. §§ 101–1330, and all rule references are to the Federal Rules of Bank-

ruptcy Procedure.

to insure PG & E's successful reorganization and preserve the court's jurisdiction over this matter." [2]

With the initial papers filed on April 9, 2001, PG & E also filed an *ex parte* application for a temporary restraining order and for an order to show cause regarding a preliminary injunction, together with supporting declarations and a memorandum of points and authorities. Through a series of stipulations between PG & E and defendants California Public Utilities Commission ("Commission"), and California Public Utilities Commissioners Loretta M. Lynch, Henry M. Duque, Richard A. Bilas, Carl W. Wood, and, Geoffrey F. Brown, all in their representative capacities ("Commissioners" and collectively with the Commission, "CPUC"), the parties agreed that PG & E's *ex parte* application for a temporary restraining order would be treated as an application for a preliminary injunction ("the Preliminary Injunction Application"), that CPUC would file a motion to dismiss, and that the matter would come before the court for argument on May 14, 2001. Pursuant to the stipulation, CPUC filed its motion to dismiss for lack of subject matter jurisdiction and failure to state a claim (the "Motion To Dismiss"); while not specifically mentioned in the stipulations, in the alternative CPUC moved for summary judgment ("Motion For Summary Judgment").

The matters were argued on May 14, 2001. Appearances are noted in the record.[3]

**2.** By stipulation of the parties, the Third Claim For Relief, seeking a declaration concerning the effect of 11 U.S.C. § 108(b), has been withdrawn from the First Amended Complaint.

**3.** The OCC also filed a motion to intervene, and adopted by reference PG & E's First Amended Complaint. The court grants that

## III. *Issues*

A. *Does sovereign immunity prohibit the court from deciding the merits of this case?*

B. *Is the Ex Parte Young exception to the sovereign immunity defense available to PG & E, as against the Commissioners?*

C. *Does the section 362(b)(4) police and regulatory power exception to the automatic stay apply?*

D. *May the court enjoin the Commissioners under section 105 in view of their claim of sovereign immunity?*

E. *If an injunction could issue, should it?*

F. *Is CPUC entitled to dismissal?*

## IV. *Discussion*[4]

California Assembly Bill No. 1890 (Stats. 1996, Ch. 854) ("AB 1890") was signed into law on September 23, 1996, to implement deregulation of electricity utilities. The legislature anticipated that market forces would drive prices "at least 20 percent" lower by April 1, 2002. Nevertheless, the legislature determined that it was "proper" to freeze retail rates at only ten percent below their levels as of June 10, 1996, for a period from 1998 into 2002, in order to "allow electrical corporations an opportunity to continue to recover" certain "transition costs." Public Util.Code § 330(a) & (s) (added by AB 1890). In its Memorandum of Points and Authorities in support of the Preliminary Injunction Application, PG & E characterizes the resulting transi-

motion. Nobody has challenged PG & E's allegations that jurisdiction and venue are proper in this court, and that this adversary proceeding is a core proceeding.

**4.** The following discussion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052(a).

tion charge as reimbursement for having previously been "required to invest in facilities that, in a more competitive environment, would likely be unproductive." One example, according to CPUC, is the construction costs of nuclear power plants. PG & E estimates that these transition costs—also known as "stranded costs"-amount to approximately $7 billion.

AB 1890 required utilities to propose a transition "cost recovery plan," using their anticipated profits based on operating costs being less than the frozen rates. The rate freeze would end on "the earlier of March 31, 2002, or the date on which the commission-authorized costs for utility generation-related assets and obligations have been fully recovered." Public Util. Code § 368(a). PG & E and other utilities "shall be at risk for those costs not recovered during that time period," and the transition costs are to be collected "in a manner that does not result in an increase in rates to customers of electrical corporations." *Id.* §§ 330(v) and 368(a).

The Commission established two types of accounts to distinguish recovery of transition costs from other operations. Monthly revenues are accounted for in a Transition Revenue Account ("TRA"). After deducting certain operating costs and other expenses, any remainder—called "headroom"—is available to pay for the utility's transition costs. Those transition costs are tracked in a Transition Cost Balancing Account ("TCBA"). *See* Commission Decision No. 97–10–057, 76 C.P.U.C.2d 140, 1997 Cal. PUC LEXIS 988 at pp. *11–*12 and *26–*27 (10/22/97).

The Commission did not initially specify exactly how the TRA and TCBA would be calculated, and at the heart of this adversary proceeding is the Commission's uncertainty whether negative monthly balances—also known as the "disconnect" or "undercollections"—should be transferred from the TRA to the TCBA. If negative monthly balances were transferred to the TCBA, the utilities would take longer to recover their transition costs, which in turn would prolong the rate freeze. Prolonging the rate freeze would appear to favor utilities in periods when operating costs are significantly below the revenue from frozen rates, and conversely would appear to disfavor utilities in periods when operating costs are at or above the revenue from frozen rates.

In 1997 the Commission approved a calculus that allowed negative balances to be transferred from the TRA to the TCBA. *See* Commission's Energy Division Resolution ("Res.") E–3514, Attachment 1 ¶ 5.i, 1997 Cal. PUC LEXIS 1267, at pp. *46–*47 (12/16/97). In 1998, however, the Commission reversed itself and determined that transferring negative balances to the TCBA would be the equivalent of inappropriately transforming operating losses from the TRA into a new set of transition costs eligible for cost recovery. *See* Res. E–3527, Discussion ¶ 5, 1998 Cal. PUC LEXIS 1027, at p. 9 (11/19/98). In 2001, in response to a petition by consumer group The Utility Reform Network ("TURN"), the Commission reversed itself again and required PG & E and another utility to transfer the negative balances to the TCBA. Commission Decision No. 01–03–082, 207 P.U.R.4th 261, 2001 Cal. PUC LEXIS 217 (3/27/01) (the "Accounting Decision").[5]

---

**5.** The Accounting Decision also determined, *inter alia,* that PG & E was experiencing "serious financial shortfalls" due to high wholesale electricity prices. Moreover, the Commission held that legislative actions, while not entirely ending the rate freeze, gave it enhanced authority to raise rates to a limited extent. *See* Accounting Decision, pp. 6–22 and 56–57. Relying on that enhanced authority, the Accounting Decision granted PG & E's

The Accounting Decision stated that, given the "accounting adjustments" it was ordering, the utilities "have not recovered all of their stranded costs" and therefore "under AB 1890 the rate freeze has not ended...." *Id.* at 20. The Commission's stated basis for the "accounting adjustments" was that:

It is inconsistent with the intent of AB 1890 to continue to allow the utilities to appear to incur substantial liabilities in their operating costs on the one hand, while they continue to recover substantial amounts for accelerated capital costs on the other.

Accounting Decision p. 27.

Accordingly, the Commission required the negative as well as the positive monthly balances in PG & E's TRA to be transferred to the TCBA, which it called a "true-up." The Commission rejected the utilities' arguments that:

(1) [the] true-up would result in operating expenses being transformed into transition costs; (2) AB 1890 did not subject the utilities to the risk of non-recovery of FERC[6] and CPUC-approved costs of providing service to their customers; (3) the accounting changes would be tantamount to retroactive rate-making; and (4) the changes could deprive the utilities of a fair rate of return and result in confiscating rates.

Accounting Decision, p. 26.

At the end of the Accounting Decision the Commission implemented these re-quirements in an "Interim Order" which states:

7. The Petition to Modify Resolution E 3527 ... is granted. The balance in PG & E's [and another utility's] respective Transition Revenue Account[s] (TRA) shall be transferred on a monthly basis to each utility's respective Transition Cost Balancing Account (TCBA). This action shall be effective as of January 1, 1998.

8. PG & E [and the other utility] shall file advice letters within 15 days of the effective date of this decision to revise their tariffs as necessary. PG & E [and the other utility] shall attach reports that restate the TRA [and] TCBA ... [accounts] in compliance with this decision. The advice letters shall be deemed in compliance with this decision only upon the written approval of the Energy Division.

*Id.* p. 57, Interim Order ¶¶ 7 and 8 (the "Ordering Paragraphs").

On April 6, 2001, PG & E filed its chapter 11 petition. That date was ten days after the Accounting Decision was issued and five days before the end of the Interim Order's 15-day compliance period. On April 23, 2001, the court approved a stipulation between PG & E and CPUC providing that "PG & E shall have an extension to comply with the provisions of [the] Ordering Paragraphs ... up through and

---

request for a three-cents per kilowatt-hour rate increase.

**6.** FERC is the Federal Energy Regulatory Commission, which has exclusive jurisdiction over wholesale electricity sales and interstate transmission under section 201 of the Federal Power Act, 16 U.S.C. § 824. PG & E filed an action against the Commissioners alleging violations of 42 U.S.C. § 1983, the Federal Power Act, and the Constitution's Supremacy Clause, Commerce Clause, Takings Clause,

Equal Protection Clause and Due Process Clause (Amend.XIV). *Pacific Gas and Electric Co. v. Lynch et al.* (C.D. Cal., Case No. CV–01–1083–RSWL (SHx)). As part of these arguments, PG & E claimed that the CPUC violated the "filed rate doctrine," which generally prohibits State agencies from setting public utility retail rates lower than the utility's wholesale costs. That case was dismissed without prejudice on May 2, 2001, on grounds of ripeness.

including the later of (a) May 21, 2001, or (b) seven days after entry of a written order on PG & E's application for a preliminary injunction." If PG & E has its way on the Preliminary Injunction Application, it will be free to ignore the Ordering Paragraphs, thus enhancing its position that the transition costs have been recovered and AB 1890's rate freeze ended in mid–2000. In turn, the Commissioners will be unable to enforce via civil or criminal measures any of the ordering provisions of the Ordering Paragraphs. The remainder of the Accounting Decision will be unaffected by any injunction this court would issue.

A. *CPUC's sovereign immunity is not absolute.*

■ Under the 11th Amendment to the Constitution, as construed by a litany of United States Supreme Court decisions, states are immune from suit in federal court unless they have waived sovereign immunity or other exceptions to the doctrine apply. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, *reh. den.*, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974); *Schulman v. California (In re Lazar)*, 237 F.3d 967 (9th Cir.2001). This doctrine has been applied to actions initiated against states[7] in the bankruptcy court, and has been extended to bar a declaratory relief action regarding state tax liability and whether that tax is dischargeable. *Mitchell v. Franchise Tax Board, State of California*, 209 F.3d 1111 (9th Cir.2000).[8]

■ PG & E argues that its requested relief against the Commissioners falls within what is known as the *Ex Parte Young* exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As discussed below, that exception permits prospective relief against officers of the state based on "the fiction that such a suit is not an action against a 'State' and is therefore not subject to the sovereign immunity bar." *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1045 (9th Cir. 2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 1485, 149 L.Ed.2d 373 (2001).

CPUC relies on *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), and argues that the court should not even consider the *Ex Parte Young* exception, because the exception allegedly does not apply where there is a "special sovereignty interest" at stake. CPUC claims the relief sought by PG & E in this adversary proceeding would "drastically interfere with California's 'special sovereignty interest' in regulating its electric utilities in this time of crisis."

■ The court rejects CPUC's "special sovereignty interest" contentions. CPUC relies on a part of the primary opinion in *Coeur d'Alene* in which only two of the Justices joined. Both the concurring opinion and the dissenting opinion reject the

---

7. Sovereign immunity extends to agencies of the state. PG & E does not contest that the Commission is entitled to assert a sovereign immunity defense.

8. As *Lazar* noted, some courts have ruled that Section 106 is effective as a waiver of the states' sovereign immunity, on the basis that the Bankruptcy Code "was enacted pursuant to Section 5 of the Fourteenth Amendment— which has long been recognized by the Supreme Court as a valid source of congressional power to abrogate state's Eleventh Amendment immunity." *Lazar*, 237 F.3d at 981, n. 15 and accompanying text (citing cases but not deciding issue). The Ninth Circuit rejected this theory, however, in *Mitchell* and this court is bound by that ruling. *Mitchell*, 209 F.3d at 1118–1120.

notion that some sovereignty interests are so "special" that a federal court should never consider the *Ex Parte Young* exception. *See Coeur d'Alene*, 521 U.S. at 296, 117 S.Ct. 2028 (O'Connor, J., rejecting principal opinion's "vague balancing test") and at 298 (Souter, J., dissenting) (noting that Justice O'Connor's view "is the controlling one").

Moreover, even if CPUC's view of the law were correct, the court does not believe that an action to restrain enforcement of two paragraphs of the Interim Order undermines any "special sovereignty interest" of California.[9] Therefore, the court will consider whether the *Ex Parte Young* exception applies in this adversary proceeding.

B. *The Ex Parte Young exception to the sovereign immunity defense is available to PG & E, against the Commissioners.*

■ In *Ex Parte Young* a railroad company's shareholders filed suit against a Minnesota railroad and warehouse commission and the attorney general of the State of Minnesota, Edward T. Young ("Young"), to enjoin their enforcement of rates prescribed by state law. The shareholders complained that the rates were confiscatory and violated the Constitution of the United States, and they obtained a preliminary injunction. Young, believing that the injunction violated the 11th Amendment, sought and obtained a state court writ commanding the company to adopt the rates. The federal court held Young in contempt, he was taken into custody, and he filed a petition for a writ of *habeas corpus* with the Supreme Court. The Supreme Court dismissed Young's petition, holding that, even though states are protected by sovereign immunity, actions can be brought against state officials in their representative capacity if they are violating federal law. *See Seminole*, 517 U.S. at 72 n. 16, 116 S.Ct. 1114 (*Ex Parte Young* is the "[m]ost notabl[e]" avenue for ensuring state compliance with bankruptcy and other federal laws). The theory of *Ex Parte Young* is that the state cannot "impart to [its] official immunity from responsibility to the supreme authority of the United States," and an "injunction to prevent him from doing that which he has no legal right to do is not an interference with [the officer's] discretion...." *Ex Parte Young*, 209 U.S. at 159, 160, 167, 28 S.Ct. 441. *See also Agua Caliente*, 223 F.3d at 1045.

CPUC argues that *Ex Parte Young* only applies to an "ongoing" violation of federal law. *See Seminole*, 517 U.S. at 72 n. 16, 116 S.Ct. 1114 (using this terminology), *and Coeur d'Alene*, 521 U.S. at 294, 117 S.Ct. 2028 (O'Connor, J., concurring)

---

9. Arguably the Ordering Paragraphs simply require accounting entries, to reflect the *fait accompli* effectuated by the Accounting Decision. Whether or not the court takes that limited a view of the Ordering Paragraphs, PG & E's request to stay their implementation or enforcement is unlike the relief sought in *Coeur d'Alene*. Plaintiffs in that case sought to divest the State of any ownership interest or even regulatory control over the submerged lands of "[o]ne of the Nation's most beautiful lakes." *Coeur d'Alene*, 521 U.S. at 264, 117 S.Ct. 2028 (primary opinion). The majority of the Supreme Court Justices thought such relief would have affected "Idaho's sovereign interest in its lands and waters ... in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.* at 287, 117 S.Ct. 2028 (primary opinion). In contrast, PG & E's request for a stay or injunction is nowhere near as intrusive. *See also Agua Caliente*, 223 F.3d at 1048 ("the question posed by *Coeur d'Alene* is not whether a suit implicates a core area of sovereignty, but rather whether the relief requested would be so much of a *divestiture* of the state's sovereignty as to render the suit as one *against the state itself*") (emphasis in original).

(same). CPUC says that the Commission issued its Accounting Decision on March 27, 2001, prior to PG & E's April 6 Chapter 11 filing, and that since then neither the Commission nor the Commissioners have done anything to enforce the Accounting Decision, or more particularly, the Ordering Paragraphs, against PG & E. Thus, CPUC contends, there is no ongoing violation of law.

The court disagrees with CPUC's interpretation of *Ex Parte Young.* The plaintiffs in *Ex Parte Young* sought to enjoin the "threat" that allegedly confiscatory rates would be enforced, and the Supreme Court stated:

> The various authorities we have referred to furnish ample justification for the assertion that individuals who, as officers of the state, are *clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings,* either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, *may be enjoined* by a Federal court of equity from such action.

*Ex Parte Young,* 209 U.S. at 155–156, 28 S.Ct. 441 (emphasis added).

Later in the same opinion the Supreme Court was even more explicit in rejecting an argument that the state statute must specifically direct the officer being sued to enforce its provisions. The Court stated that in earlier rate-making cases "the only wrong or injury or trespass involved was the *threatened commencement* of suits to enforce the statute as to rates, and the *threat* of such commencement was in each case regarded as sufficient to authorize the issuing of an injunction to prevent the same." *Id.* at 158, 28 S.Ct. 441 (emphasis added).

The court is convinced that the Ordering Paragraphs present sufficient "threat" that CPUC will implement or enforce the Accounting Decision to come within the *Ex Parte Young* exception.[10] PG & E has alleged that such implementation or enforcement would violate federal law—by violating the automatic stay, and on various other grounds including its argument that the Accounting Decision imposes an ongoing confiscatory rate or "taking" in violation of the Constitution. PG & E is entitled to have the court's ruling whether the automatic stay will "freeze" the *status quo* and give it a "breathing spell" from such alleged violations of Federal law, or whether the court will enjoin such alleged violations. *See Hillis Motors, Inc. v. Ha-*

---

**10.** As already noted, the Supreme Court has reaffirmed the validity of *Ex Parte Young* in *Seminole* and *Coeur d'Alene.* Moreover, in *Agua Caliente* the Ninth Circuit rejected an argument that was very similar to CPUC's argument. In that case the California State Board of Equalization (the "Board") assessed food and beverage sales taxes, allegedly in violation of federal law, against a native American Indian tribe (the "Tribe"). Like CPUC in this case, the Board threatened enforcement but had not actually commenced enforcement: the Board "informed the Tribe that if it failed to pay the tax within one month, the Department of Alcoholic Beverage Control [the 'ABC'] would suspend its alcoholic beverage license." *Agua Caliente,* 223 F.3d at 1044. Like PG & E, the Tribe brought an action for declaratory and injunctive relief. As in this case, in which CPUC has agreed not to enforce the Ordering Paragraphs until after the court's decision, in *Agua Caliente* the ABC and its director "agreed not to suspend the Tribe's liquor license pending the outcome of the litigation." *Id.* at 1044. Given this absence of any pending enforcement action, the defendants in *Agua Caliente* argued that the federal courts should not intervene and that the Tribe had an adequate remedy at law—namely, paying the tax and then suing for a refund in state court on the basis of its federal claims. As this court does, the Ninth Circuit rejected these arguments and held that *Ex Parte Young* applied.

*waii Auto. Dealers' Ass'n,* 997 F.2d 581, 585 (9th Cir.1993) (stay designed to freeze *status quo* ); *Delpit v. Commissioner,* 18 F.3d 768, 771 (9th Cir.1994) (stay designed to give debtors breathing spell).

Under these circumstances the court is satisfied that there has been at the minimum a *prima facie* allegation to permit PG & E to invoke the *Ex Parte Young* exception and seek an injunction against the Commissioners.[11] The court therefore reaches the merits of these issues.

C. *Assuming the automatic stay applies under sections 362(a)(1) and (3), the exception in section 362(b)(4) also applies.*

█ PG & E seeks a declaration that the Ordering Paragraphs cannot be implemented and enforced because, under 11 U.S.C. § 362(a)(1), such acts would constitute "commencement or continuation" of an administrative proceeding "against the debtor that was or could have been com-

menced before commencement of [PG & E's bankruptcy] case." PG & E also seeks a declaration that such acts are stayed under § 362(a)(3) because they would "exercise control over property of the estate."

PG & E argues that implementing the Ordering Paragraphs will cause the estate to lose $4 billion until the rate freeze ends on March 31, 2002. In addition, PG & E argues that what CPUC describes as mere "accounting adjustments" could permanently bar PG & E from recovering its transition costs, including over $7 billion already accumulated in the TCBA as of the petition date.[12]

The court assumes without deciding that implementing or enforcing the Ordering Paragraphs would be "continuation" of a pre-petition administrative proceeding "against" PG & E.[13] The court also assumes without deciding that implementing and enforcing the Ordering Paragraphs would be acts "to exercise control"[14] over

---

**11.** No serious argument has been put forth by PG & E that would prevent dismissal of the Commission whether or not an injunction may issue against the Commissioners under the *Ex Parte Young* exception to sovereign immunity.

**12.** CPUC claims that if the Accounting Decision is reversed then the TRA and TCBA can be restated. When pressed at oral argument, however, counsel for CPUC would not say whether restating the accounts would make any difference to PG & E's actual ability to recover its transition costs, which might end when the rate freeze ends.

**13.** CPUC argues that the Accounting Decision is "legislative" in nature and therefore is not within section 362(a)(1). CPUC cites no authority for such a broad exception to the automatic stay. CPUC appears to be arguing that its actions are of general application, and not directed specifically "against" PG & E within the meaning of section 362(a)(1).

PG & E, on the other hand, argues that CPUC is merely adjudicating "private rights."

PG & E argues that TURN initiated a proceeding against PG & E by filing its petition "against" PG & E and in derogation of PG & E's "private right" to be paid its transition costs (*see* footnote 15, *infra* ). In addition, PG & E argues that the Ordering Paragraphs are directed specifically against PG & E and must be implemented by far more than ministerial actions, all of which make the proceedings more like an ongoing "adjudication" and less like "legislation."

**14.** There is some disagreement in the cases whether regulatory actions are really acts to "control" property of the estate within the meaning of section 362(a)(3). *Cf. In re Burgess,* 234 B.R. 793 (D.Nev.1999) (holding that revocation of brothel's license was an act to control property of estate, but noting that some authorities hold that regulations governing use of a license do not "control" estate property). The courts holding that regulation is not "control" of estate property may have been influenced by the fact that, prior to the 1998 amendments to the Bankruptcy Code, the "police and regulatory" exception in Section 364(b)(4) did not apply to Section

at least three types of "property of the estate" —the current cash and other assets of the estate that may have to be expended to pay increased operating expenses without a corresponding rate increase, PG & E's contingent right to recover transition costs,[15] and PG & E's causes of action for relief from the Accounting Decision.[16]

Nonetheless, the court believes the Commissioners' implementation and enforcement of the Ordering Paragraphs fall within the "police and regulatory" exception to the automatic stay. 11 U.S.C. § 362(b)(4).

Section 362(b)(4) provides, in relevant part:

(b) the filing of a [bankruptcy petition] does not operate as a stay—

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such govern-

---

362(a)(3). *See id.* The Ninth Circuit apparently was not among those courts. *See Hillis Motors,* 997 F.2d 581 (holding, prior to 1998 amendments, that dissolving debtor corporation while automatic stay was in effect was stayed as an act to exercise control over estate property) *and Maricopa County v. PMI–DVW Real Estate Holdings, LLP (In re PMI–DVW Real Estate Holdings, LLP),* 240 B.R. 24, 30 (Bankr.D.Ariz.1999) (discussing *Hillis*).

**15.** California law provides that retail customers within PG & E's territory as of December 20, 1995, have a "nonbypassable" obligation to pay PG & E's transition costs, which cannot be avoided by switching electricity providers. *See* Public Util.Code §§ 367, 369, 370 and § 392(c)(2). Although PG & E's rights to recover the transition costs are contingent, numerous courts have recognized that contingent rights are protected "property" of the estate for purposes of the automatic stay. *See generally Official Committee of Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines, Inc.),* 107 B.R. 832, 839 and 843 (Bankr.S.D.N.Y.1989) (debtor's contingent rights to use net operating losses to offset future income were property of estate, and where debtor's parent corporation could prevent debtor from using such losses by claiming worthless stock deduction, such deduction "would constitute a violation of the stay contained in § 362(a)(3) and should be enjoined"); *Gumport v. Interstate Commerce Comm'n (In re Transcon Lines),* 147 B.R. 770 (Bankr.C.D.Cal.1992) (debtor's "filed rate

claims" were property of bankruptcy estate, and federal agency's regulations governing allowability of such claims, promulgated specifically for application to debtor's case, were void as to debtor's estate); *Burgess, supra,* 234 B.R. 793 (surveying cases re property of estate). *Cf. Wade v. State Bar of Arizona (In re Wade),* 115 B.R. 222, 228 (9th Cir. BAP 1990) (nontransferable professional license is not a property interest), *aff'd,* 948 F.2d 1122 (9th Cir.1991); *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, *reh. den.,* 705 F.2d 450 (5th Cir.1983) ("[w]e cannot accept Braniff's characterization of [airport landing] slots as its property").

**16.** PG & E asserts that CPUC's interpretation of AB 1890 amounts to an unconstitutional "taking" or is otherwise invalid. PG & E's causes of action are property of the estate. *See Nu–Process Brake Engineers, Inc. v. Benton (In re Nu–Process Brake Engineers, Inc.),* 119 B.R. 700, 702 (Bankr.E.D.Mo.1990) (debtor's right to pursue reinstatement of sale tax license pursuant to Missouri statutory law was asset of its Chapter 11 estate). Implementing and enforcing the Accounting Decision arguably could be acts to "exercise control" over these causes of action, because if rates are set pursuant to the Accounting Decision then PG & E might not have enough time to collect its transition costs before March 31, 2002, even if the Accounting Decision is later reversed. *See* footnote 12, *supra,* and accompanying text.

mental unit's ... police or regulatory power.

11 U.S.C. § 362(b)(4).

■■■ Exceptions to the automatic stay are construed narrowly. *Hillis Motors, supra,* 997 F.2d at 590. The Ninth Circuit has held that the "phrase 'police or regulatory power' refers to the enforcement of laws affecting health, welfare, morals and safety, but not regulatory laws that directly conflict with the control of the res or property by the bankruptcy court." *Universal Life Church, Inc. v. U.S. (In re Universal Life Church),* 128 F.3d 1294, 1297 (9th Cir.1997) (*citing Hillis* ), *cert. denied,* 524 U.S. 952, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998). The Ninth Circuit elaborated this standard in two tests for determining whether governmental actions fit within the section 362(b)(4) exception:

(1) the "pecuniary purpose" test and (2) the "public policy" test. *NLRB v. Continental Hagen Corp.,* 932 F.2d 828, 833 (9th Cir.1991). Under the pecuniary purpose test, the court determines whether the government action relates primarily to the protection of the government's pecuniary interest in the debtor's property or to matters of public

safety and welfare. *Id.* If the government action is pursued solely to advance a pecuniary interest of the governmental unit, the stay will be imposed. *Thomassen v. Division of Med. Quality Assurance (In re Thomassen),* 15 B.R. 907, 909 (9th Cir. BAP 1981).

The public policy test "distinguishes between government actions that effectuate public policy and those that adjudicate private rights." *Continental Hagen,* 932 F.2d at 833 (quoting *NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 942 (6th Cir.1986)).

*Universal Life,* 128 F.3d at 1297.[17]

Addressing the "pecuniary purpose" test, PG & E argues that the high cost of wholesale electricity is an unavoidable fact, and the Accounting Decision simply makes a pecuniary choice to shift much of that cost from PG & E's customers (and the State of California) to PG & E. That may be so, but the primary purpose of the Accounting Decision—taken as a whole—and the Ordering Paragraphs—looked at specifically as to PG & E—is to implement an important public policy, *viz* rate-making.[18] The fact that the result may be a

---

17. Application of the tests outlined by *Universal Life* is not entirely clear. Although that case directs this court to determine whether the government action relates "primarily" to its pecuniary interest, the opinion later states, in *dicta,* that "[o]nly if the [government's] action is pursued '*solely* to advance a pecuniary interest of the governmental unit' will the automatic stay bar it. *Thomassen,* 15 B.R. at 909." *Universal Life,* 128 F.3d at 1299 (emphasis added) (*dicta* because court was rejecting inverse proposition: that IRS "must have no pecuniary motive at all to fall within section 362(b)(4)"). The *Universal Life* court's quotation appears nowhere in *Thomassen* and appears to be a misreading of that case. Later cases have quoted both the "primarily" and the "solely" language of *Universal Life. See In re Dunbar,* 235 B.R. 465 (9th Cir. BAP 1999) (*dicta,* because court did not decide

§ 362(b)(4) issue), *aff'd,* 245 F.3d 1058 (9th Cir.2001); *First Alliance, supra,* 263 B.R. at 110 (*dicta,* because court held that agency actions fell "squarely within its public policy mandate" and were "primarily concerned with consumer protection"). This court does not resolve this ambiguity because, as set forth in the text, the actions of the CPUC are primarily within the "public policy" test rather than the "pecuniary purpose" test.

18. In its papers PG & E elaborates that the effect of the Ordering Paragraphs is to "confer an economic benefit on electricity consumers—artificially low, below-cost rates—at the expense of the estate and its creditors." The court looks to the substance of CPUC's action, not just its form, and finds some factual and legal support for PG & E's argument. *See In re Jal Gas Co.,* 44 B.R. 91, 94 (Bankr.

negative economic impact on PG & E, and a positive economic impact on PG & E's customers, does not change the fact that CPUC's rate-making implements public policy. *See Berg v. Good Samaritan Hospital (In re Berg)*, 230 F.3d 1165, 1168 (9th Cir.2000) (rejecting argument that benefit to private party undermined "public policy" nature of government action as "overly-literal" interpretation of pecuniary purpose test).

PG & E next argues that rather than implementing public policy the Accounting Decision merely "adjudicates" "private rights." PG & E apparently means that the Accounting Decision favors consumers at its expense. That does not turn the Accounting Decision into an adjudication. To the contrary, the Accounting Decision is more legislative in character. It affects rates within PG & E's historic territory, rather than deciding any cause of action between individual consumers and PG & E; and it does not give refunds to individual consumers who used to live in that territory or who move out in future. Therefore, the Accounting Decision does not "adjudicate" "private rights." [19]

PG & E also argues that the Accounting Decision is an attempt to avoid the federal "filed rate doctrine," which allegedly requires CPUC to set retail rates at least equal to PG & E's wholesale cost of electricity. In other words, PG & E claims CPUC was motivated to use a methodology that nets-out PG & E's monthly profits and losses over the entire period of the retail rate freeze, so that it could argue

D.N.M.1984) (order of state public utilities commission requiring debtor utility to reimburse customers for alleged overpayments held within scope of § 362(a)(1)). *See also In re Charter First Mortgage, Inc.*, 42 B.R. 380, 384 (Bankr.D.Or.1984) (action by State of Washington seeking restitution of moneys on behalf of certain citizens for violations of Consumer Protection Act was subject to automatic stay). *But cf. Commonwealth of Mass. v. First Alliance Mtg. Co. (In re First Alliance Mtg. Co.)*, 263 B.R. 99 (9th Cir. BAP 2001) (discussing Ninth Circuit authority, and criticizing *Charter First Mortgage* for not distinguishing between state's acts through "entry of judgment," which typically are not stayed, and "enforcement of judgment" against the estate, which typically is stayed).

Nonetheless, even if CPUC's actions have a pecuniary component, for the reasons set forth in the text those actions are primarily rate-making, which is within the "public policy" test.

19. The court recognizes that transferring negative balances from the TRA to the TCBA may reduce or eliminate PG & E's eventual recovery of its transition costs from retail consumers, unless CPUC's decision is reversed or modified. That effect, however, cannot be separated from CPUC's rate-making function, in part because the TCBA serves both to measure the end of the rate freeze and to measure PG & E's recovery of its transition costs. Nor are the Ordering Paragraphs analogous to "enforcement of ... a money judgment," which is an exception to section 362(b)(4). The negative balances or "disconnect" recorded in the TRA are not "claims" by anyone against PG & E and there is no "judgment" against PG & E. Nor is transferring the negative balances to the TCBA equivalent to "enforcement" of a judgment such as levying a bank account. The TCBA is more of a bookkeeping device than a bank account. *Cf. First Alliance, supra*, 263 B.R. 99 (holding that § 362(b)(4) allows governmental unit to obtain a judgment but not to enforce that judgment against the estate's assets). Changing the "balance" of the TCBA is simply one aspect of ultimately determining what rates PG & E may collect in future to recover its transition costs. That is inseparable from rate-making. *See Behles v. New Mexico Public Service Commission (Application of Timberon Water Co., Inc.)*, 114 N.M. 154, 158–159, 836 P.2d 73, 77–79 (1992) (regulators' decision to deny bankrupt utility a reasonable rate of return on $2,245,186 invested in water system, on ground that investment was not by utility but by customers as "contributions in aid of construction," was part of rate-making and within police and regulatory power exception to automatic stay), *distinguishing Jal Gas, supra*, 44 B.R. 91.

that over time PG & E has recouped its wholesale costs, even if PG & E has not recouped its wholesale costs in some individual months.

PG & E's argument misses the mark. The Accounting Decision is no less an implementation of "public policy" because CPUC chose one rate-making calculus over another. To the contrary, that choice is the essence of CPUC's rate-making authority over PG & E as a public utility, and regulation of utilities "is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Electric Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983). CPUC's rate-making decisions involve a complex analysis of legislative intent and a host of other factors, as set forth in the Accounting Decision. The fact that implementing that decision is expected to be expensive for PG & E does not take away from the important public policy decisions involved.

Moreover, PG & E's limitation on rate-making would be impossible to implement. If the automatic stay barred CPUC from applying its view of AB 1890, as PG & E suggests, would it also bar CPUC from setting rates based on any other charge that could result in a monthly loss for PG & E, such as PG & E's share of nuclear decommissioning costs? Would the automatic stay bar only rate decreases but not increases, like the three-cents per kilowatt hour increase in the Accounting Decision itself? The bottom line is that PG & E would simply use the automatic stay to substitute its own rate (based on the assumption that CPUC is wrong on some issues) for the existing rate. The automatic stay is not intended for that purpose.

In sum, the Ordering Paragraphs implement CPUC's "public policy" decisions in setting public utility rates. The "police and regulatory" exception to the automatic stay applies to implementation and enforcement of the Accounting Decision, including the Ordering Paragraphs.[20]

**20.** Other courts have gone further than this court in ruling that, notwithstanding a pecuniary purpose, the governmental action at issue primarily implemented public policy. For example, the Second Circuit held that, under section 362(b)(4), the Federal Communications Commission was not stayed from re-auctioning the debtor's license solely because the debtor failed to make timely license payments. The Second Circuit reasoned that Congress "was not *chiefly* interested in maximizing license-holders' contributions to the fisc" but instead used licensees' ability to make timely payments as a "predictive mechanism" to assure that licensee was "most likely to use [radio spectrum] Licenses efficiently for the benefit of the public." *In re F.C.C.*, 217 F.3d 125, 131–137 (2nd Cir.2000) (emphasis added), *cert. denied sub nom NextWave Personal Communications, Inc. v. F.C.C.*, 531 U.S. 1029, 121 S.Ct. 606, 148 L.Ed.2d 518 (2000), *quoting F.C.C. v. NextWave Personal Communications, Inc. (In re NextWave Personal Communications, Inc.)*, 200 F.3d 43, 54 (2nd Cir.1999), *cert. denied*, 531 U.S. 924, 121 S.Ct. 298, 148 L.Ed.2d 240,

*reh. denied*, 531 U.S. 1030, 121 S.Ct. 609, 148 L.Ed.2d 519 (2000) (emphasis added). This court need not go as far as the Second Circuit to rule that although CPUC allegedly has a pecuniary purpose in shifting the cost of California's electricity emergency to PG & E, it is doing so as part of the public purpose of rate-making.

In another analogous case the Supreme Court has held that the "police and regulatory" exception underlying both section 362 and 28 U.S.C. § 959(b) allowed a state to enforce environmental protection laws preventing abandonment of a hazardous site, even though enforcing those laws would drain assets of the estate and even though the bankruptcy court had found that the "City and State are in a better position in every respect than either the Trustee or debtor's creditors to do what needs to be done to protect the public against the dangers posed by the [hazardous] facility." *Midlantic Nat. Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 498, 504, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (quoting bankruptcy court). Again, public policy superseded pecuniary

D. *There is no basis for an injunction under section 105 in view of CPUC's sovereign immunity.*

█ PG & E argues that section 105 provides broader relief than section 362. It is correct. The Ninth Circuit has stated:

There [is] a procedural avenue to forfend state actions that are not subject to the automatic stay but that threaten the bankruptcy estate: a request for an injunction under 11 U.S.C. § 105. The bankruptcy court's injunctive power is not limited by the delineated exceptions to the automatic stay....

*Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1087 (9th Cir.2000) (*en banc* ). *See also National Labor Relations Board v. Jonas (In re Bel Air Chateau Hospital)*, 611 F.2d 1248, 1251 (9th Cir.1979) (stays of regulatory proceedings are not automatic, but can be granted if party shows necessity for stay).

█ Nonetheless, apart from section 362, PG & E has not shown any possible violation of federal law by the Commissioners. It is well established that the "[e]xercise of § 105 powers must be linked to another specific Bankruptcy Code provision." *Graves v. Myrvang (In re Myrvang)*, 232 F.3d 1116, 1125 (9th Cir.2000). The fact that PG & E will suffer significant losses if the Accounting Decision is enforced does not constitute a violation of federal law. *See Baker & Drake, Inc. v. Public Service Comm'n of Nevada (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1354 (9th Cir.1994) ("Simply making a reorganization more difficult for a particular debtor" does not rise to level of frustrating Congress' purposes and objectives). In short, PG & E has failed to show any statutory basis to invoke section 105 to prevent CPUC from carrying out its rate-making functions.

E. *Even if an injunction could issue, PG & E has not demonstrated irreparable harm, a balance of hardships in its favor, a likelihood of prevailing on the merits, or that the public interests would be served.*

█ If the court is in error about the absence of any threatened violation of federal law, then the question of whether or not an injunction should issue turns upon the traditional elements of whether there is a demonstration of irreparable harm to plaintiff, the balance of hardships, a likelihood of prevailing on the merits, and the advancement of the public interest. *See Johnson v. California State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995). Alternatively, a preliminary injunction may issue if the movant demonstrates "*either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* at 1430 (emphasis in original, quotation marks and citations omitted).

In the bankruptcy context, there is authority that a threat to the debtor's ability to reorganize or interference with the bankruptcy court's jurisdiction can establish or substitute for the various elements in appropriate circumstances. *See Walsh v. West Virginia (In re Security Oil & Gas)*, 70 B.R. 786, 793 n. 3 (Bankr. N.D.Cal.1987) (interpreting "success on the merits" element in bankruptcy context); *Public Serv. Co. of New Hampshire v. New Hampshire (In re Public Serv. Co. of New Hampshire)*, 98 B.R. 120, 124 (Bankr.D.N.H.1989) (same); *LTV Steel Co. v. Board of Educ. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y.1988) ("irreparable injury" element); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y.1987) ("irreparable damage" element); *Maxicare Health Plans, Inc. v.*

considerations. *See also Timberon Water, supra,* 114 N.M. 154, 836 P.2d 73.

*Centinela Mammoth Hosp. (In re Family Health Servs., Inc.)*, 105 B.R. 937, 945 (Bankr.C.D.Cal.1989) ("public interest" element).

None of these elements is present.[21]

1. *No irreparable harm.* PG & E predicts that between now and March 31, 2002, when it will be entitled under AB 1890 to raise rates, it may lose as much as $4 billion. That is an enormous sum of money for any entity to lose, but PG & E has not shown that even in the face of such losses, reorganization would be threatened. Nor has PG & E shown any other irreparable harm that would warrant the extraordinary remedy of interfering with state regulation, or interposing this court's injunction in place of PG & E's normal avenues for relief from the Accounting Decision. *Cf. Penn. Pub. Util. Comm'n v. Metro Transportation Co. (In re Metro Transportation Co.)*, 64 B.R. 968, 973–975 (Bankr.E.D.Pa.1986).[22]

2. *Balance of hardships.* PG & E has made no showing what hardships would follow from the projected financial consequences of the Accounting Decision. Nor has PG & E shown that any hardships to its creditors, its shareholders or PG & E itself would outweigh the hardships to its customers and to California if the rate freeze were lifted, or if any part of the Ordering Paragraphs were enjoined.

3. *Likelihood of prevailing on the merits.* This element for an injunction is difficult to apply to this case. Should the court speculate whether PG & E will ultimately have the Accounting Decision reversed by CPUC or the California state courts, and enjoin its enforcement pending the outcome of those proceedings? Should this court stay enforcement of the Accounting Decision long enough for PG & E to prosecute its "filed rate" claims, either in state courts or in federal district court? These questions are impossible to answer, but suffice it to say that the court will not speculate whether PG & E will be successful in any or all of those *fora*. As already noted, PG & E has not shown that the

---

**21.** The court rejects PG & E's argument that under *Bel Air* the court can issue an injunction based solely on a "threat" to assets of the estate. In *Bel Air* the Ninth Circuit stated that if regulatory proceedings "threaten the assets of the estate, the decision to issue a stay can then be made on a discretionary basis," and such stays "are appropriate when it is likely that the [regulators'] court proceedings will threaten the estate's assets." *Bel Air*, 611 F.2d at 1251. This court reads *Bel Air*'s comments as expressions of when bankruptcy courts should *consider* injunctive relief, not an evisceration of the standards for *granting* such relief.

The court also rejects PG & E's argument that an injunction should issue because of CPUC's alleged "bad faith," consisting of actions that are allegedly "seriously and substantially inconsistent with the provisions of the Bankruptcy Code—actions that, in the reorganization context, threaten the rehabilitative policies underlying chapter 11 of the Bankruptcy Code." *Pub. Serv. Co.*, 98 B.R. at 125. CPUC's actions are a proper exercise of its police and regulatory power, not inconsistent with the Bankruptcy Code but to the contrary specifically excepted from the automatic stay.

**22.** In *Metro Transportation* the court emphasized the "extraordinary" situation and that its injunction was only preliminary. *Metro Transportation*, 64 B.R. at 974, 976. That court temporarily enjoined an agency's denial of the debtor taxi-cab company's application to self-insure, and encouraged the debtor to pursue normal avenues for review of the agency's action to avoid federal-state conflicts. The court emphasized that the agency had made no findings on the key issue of the debtor's financial ability to self-insure, that shutting down the business would be contrary to the agency's stated goal of protecting accident victims because pre-existing victim-creditors would not be paid, and that the agency's action not only threatened the reorganization but would also impede liquidation, cause loss of jobs and deprive the public of over half its taxi-cabs. *Id.* at 973–975. PG & E has presented no similar facts.

Accounting Decision prevents it from reorganizing. PG & E has not met its burden to show a likelihood of prevailing on the merits.

4. *Public interest.* The public interest will not be served by issuing an injunction. The court cannot imagine how it could take a 59–page decision of the Commission—containing 78 findings of fact, 32 conclusions of law, and 12 ordering paragraphs—excise exactly two of the ordering paragraphs, and stay their enforcement. Moreover, doing so would create jurisdictional chaos. The public interest is better served by deference to the regulatory scheme and leaving the entire regulatory function to the regulator, rather than selectively enjoining the specific aspects of one regulatory decision that PG & E disputes. PG & E has all the usual avenues for relief from the Accounting Decision, including appellate review and reconsideration by CPUC. These alternatives may be particularly apropos in the constantly-changing factual and regulatory environment. How would this court stay enforcement of all or part of the Accounting Decision without reviewing the merits of that decision and interfering with these normal review procedures? How would the Commission deal with PG & E's own pending motion to reconsider the Accounting Decision if the court enjoined CPUC as requested? There are no answers. PG & E has made no showing why such jurisdictional collision and interference with CPUC's ongoing regulatory functions would be in the public interest.

F. *CPUC is entitled to dismissal.*

The First Amended Complaint, as noted above, seeks a declaration as to the applicability of the automatic stay and a preliminary and permanent injunction. Under sovereign immunity principles the court cannot impose either form of relief against the Commission, but the court can determine whether the Commissioners should be enjoined under the *Ex Parte Young* doctrine, based on the court's determinations whether section 362 applies or whether there is some other basis for an injunction under section 105. The court has determined that section 362(b)(4) exempts CPUC's rate-making function, as embodied in the Accounting Decision, from section 362(a)(1) and (3). In addition, PG & E has not alleged any other actual or threatened violation of federal law. Therefore, since PG & E is not entitled to any relief under the First Amended Complaint, it should be dismissed.

V. *Conclusion*

In light of the foregoing, PG & E's Preliminary Injunction Application will be denied, the Motion To Dismiss will be granted and the Motion For Summary Judgment will be denied as moot. Counsel for CPUC should submit a form of order consistent with this Memorandum Decision and should comply with B.L.R. 9021–1 and 9022–1.