In re PACIFIC GAS & ELECTRIC COMPANY, Debtor.

No. 01–30923DM.

United States Bankruptcy Court, N.D. California.

Feb. 7, 2002.

James L. Lopes, Janet A. Nexon, Howard, Rice, Nemerovski, Canady, et al., San Francisco, CA, Robert A. Can Nest, Law Offices of Keker and Van Nest, San Francisco, CA, Richard Levin, Skadden, Arps, Slate, Meagher and Flom, Los Angeles, CA, Dianne Coffino, Michael C. Hefter, Robert C. Myers, Benjamin Hoch, Marc Hirschfield, Law Offices of Dewey Ballantine, New York City, David Agay, Law Offices of Winston and Strawn, Chicago, IL, for Debtor.

Paul S. Aronzon, Robert Jay Moore, Milbank, Tweed, Hadley and McCloy, Los Angeles, CA, for E and Y Capital Advisors.

Stpehen L. Johnson, Office of U.S. Trustee, San Francisco, CA, for Linda Ekstrom Stanley, U.S. Trustee.

## MEMORANDUM DECISION REGARDING PREEMPTION AND SOVEREIGN IMMUNITY

DENNIS MONTALI, Bankruptcy Judge.

### I. *Introduction*

On September 20, 2001, Debtor, Pacific Gas and Electric Company ("PG & E"),

and its corporate parent, PG & E Corporation ("Corporation", and together with PG & E, "Proponents") filed their first plan of reorganization for PG & E and a disclosure statement.

On December 4, 2001, this court conducted a status conference regarding objections to the September 20th disclosure statement, and by Order Rescheduling Hearings On Approval Of Disclosure Statement ("Rescheduling Order") filed December 5, 2001, the court fixed December 19, 2001, as the date for Proponents to file a revised plan of reorganization and a revised disclosure statement. On December 19, 2001, Proponents filed their First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code For Pacific Gas and Electric Company (the "Plan") and their First Amended Disclosure Statement For First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code For Pacific Gas and Electric Company Proposed By Pacific Gas and Electric Company and PG & E Corporation (the "Disclosure Statement").

The Rescheduling Order directed Proponents to include in the Disclosure Statement a description specifically of

> ... (1) the laws and regulations [Proponents] seek[ ] to preempt through confirmation of [Proponents' Plan]; (2) the governmental units affected by any such preemption; and (3) how the various transactions contemplated by the [Plan] will affect certain executory contracts and [PG & E's] obligations under those contracts.

That order set forth a schedule for consideration of various objections to the adequacy of the Disclosure Statement, including any objections to be filed by the California Public Utilities Commission ("Commission" or "CPUC"), the Attorney General of the State of California ("State"), and any other governmental unit contending that the Plan is facially invalid based upon sovereign immunity or impermissible federal preemption.

Thereafter the State, the Commission, and various other parties filed their objections, memoranda and supporting papers and Proponents and the Official Committee of Unsecured Creditors ("Committee") filed their memoranda and supporting papers in defense of the Plan and Disclosure Statement. The court conducted a hearing on the sovereign immunity and preemption challenges on January 25, 2002.

During oral argument counsel for Corporation stated "Your honor makes the law." This court doubts that with the stroke of a pen upon an order confirming the Plan it could make federal law and sweep aside a substantial body of nonbankruptcy law. Rather, the court believes its job is to interpret and apply the law, searching where in the Bankruptcy Code nonbankruptcy law is specifically preempted and where, under controlling case law, the purposes of federal bankruptcy law are frustrated such that federal law must prevail over specific conflicting state law.

For the reasons explained below, the court concludes that there is no express preemption of nonbankruptcy law that permits a wholesale unconditional preemption of numerous state laws, some of which are identified in the Disclosure Statement and some of which are obscured by the phrase "including but not limited to." Thus, if Proponents adhere to their contention that express preemption is available to them, the Disclosure Statement must be disapproved since the Plan could not be confirmed in the face of the vigorous objections made by the State and the Commission.

Nonetheless, the court believes that the Plan could be confirmed if Proponents are able to establish with particularity the req-

uisite elements of implied preemption. If the Disclosure Statement is amended consistent with this Memorandum Decision, the court will approve it and let the Proponents test preemption at confirmation.

The court also believes the Plan as drafted offends sovereign immunity because it seeks affirmative relief against the State and the Commission. If the Plan and Disclosure Statement are amended as Corporation's counsel intimated they would be, then the Plan will overcome the sovereign immunity defense. If, however, Proponents leave unchanged the provisions of the Plan that seek injunctive and declaratory relief against the Commission and the State, they will have to prove that there has been a waiver of sovereign immunity. In that case the Disclosure Statement must be amended to describe why Proponents believe sovereign immunity has been waived.

## II. *Preliminary Observations*

A. In theory, if no one objected to the Plan and Disclosure Statement, Proponents are probably correct that the Plan *could* be confirmed. The court would not independently block an unchallenged march to confirmation. But Proponents' request that the court not "kill" the Plan now is not persuasive given the serious clash between state and federal law presented by the Plan and the Commission's and the State's strenuous opposition to it. From the commencement of this case the antagonism between PG & E and the Commission has been palpable. The sweep of preemption in the Plan and Disclosure Statement will not go unchallenged. The situation here is not unlike what the court was presented with in the celebrated public utility bankruptcy of *Public Service Company of New Hampshire.* There the court chose to decide the preemption issue in an adversary proceeding, before confirmation. *See Public Service of New Hampshire v. State of New Hampshire (In re Public Service Company of New Hampshire)*, 99 B.R. 506, 509 (Bankr.N.H.1989) (*"Public Service"*) ("In the present case there is no uncertainty or contingency about the dispute arising in concrete form between the [debtor] and the [state].") The magnitude and complexity of this case weigh heavily in favor of addressing the central issues as early as possible. Once Proponents file a revised plan and set forth in a revised disclosure statement how the various state laws and regulations frustrate Congressional purposes and objectives, the stage will be set for Proponents to attempt to establish that the Plan should preempt conflicting state law at confirmation.

B. As the development of the reorganization plan for PG & E has progressed throughout this case, Proponents have submitted mark-ups of the Plan and the Disclosure Statement as recently as February 4, 2002. Thus, for reasons wholly apart from the preemption and sovereign immunity issues, the plan of reorganization and its accompanying disclosure statement are very much works in progress. For simplicity, however, the court will refer to the Plan and the Disclosure Statement (filed December 19, 2001) for purposes of the analysis that follows. The February 4th submission has not been reviewed.

Also for convenience in this Memorandum Decision, the court's reference to non-bankruptcy "law(s)" will include statutes, regulations, Commission decisions, Commission rules, Commission resolutions and all other state law authorities that Proponents seek to preempt through confirmation of the Plan.

C. The following discussion deals with arguments made by the State and the Commission. To the extent other objectors joined the State and the Commission,

their positions are addressed below. The court will only make the following brief comments about other objections.

The California Hydropower Reform Coalition argues, in part, that the rate making authority of the Commission which is not challenged under the Plan will be implicated because its traditional jurisdiction over some of PG & E's properties will cease. It also contends that the Proponents cannot be selective, preempting some state laws but not other state and federal laws. The court is not persuaded by those arguments. Similarly, the City and County of San Francisco maintains that the deference bankruptcy law pays to state law for the definition of property rights somehow supports its opposition to Proponents' attempted preemption of state laws in the Plan. The court also rejects those arguments. Any other remaining objections by other parties are largely rendered moot in view of the obvious fact that, unless this court's decision is reversed on appeal, the Plan and Disclosure Statement will have to be modified consistent with this Memorandum Decision.

III. *Provisions of Plan Calling For Preemption*

Proponents' full-scale attack on any state law that interferes with the Plan is anything but subtle:

> Section 1123(a) of the Bankruptcy Code preempts any otherwise applicable non-bankruptcy law that may be contrary to its provisions. Accordingly, a plan may contain certain provisions that would not normally be permitted under non-bankruptcy law. For example, section 1123(a)(5) of the Bankruptcy Code authorizes, among other things, the sale or transfer of assets by [PG & E] without the consent of the State or the [Commission].

Disclosure Statement, 4:18–23.

Then they continue:

> The preemptive effect of the Confirmation Order extends to all statutes, rules, orders and decisions of the [Commission] otherwise applicable to the Restructuring Transactions and the implementation of the Plan. In the Proponents' view, the Confirmation Order supersedes any statute, rule, order or decision that the [Commission] might interpret to otherwise apply to the Restructuring Transactions and the implementation of the Plan *whether specified here or not.* The statutes, rules, orders or decisions thus preempted *include, but are not limited to,* the following. . . .

Disclosure Statement, 129:15–20 (emphasis added).

Proponents argue that confirmation of the Plan will have the following results:

> Accordingly, the Proponents contend that the Confirmation Order approving the Plan and authorizing the transactions pursuant to the Plan will preempt 'otherwise applicable nonbankruptcy law' in the following areas: (1) any approval or authorization of the [Commission] or compliance with the California Public Utilities Code or [Commission] rules, regulations or decisions otherwise required to transfer public utility property (including authorizations to construct facilities), issue securities and implement the Plan; and (2) the exercise of discretion by any other state or local agency or subdivision to deny the transfer or assignment of any of [PG & E's] property, including existing permits or licenses, or the issuance of identical permits and licenses on the same terms and conditions as the [PG & E's] existing permits and licenses where both the Reorganized Debtor and one or more of ETrans, GTrans and Gen require such permit or license for their post Effective

Date operations. Such preemption pursuant to section 1123(a) of the Bankruptcy Code shall occur at the time the Plan is implemented.[1]

Disclosure Statement, 10:9–20.

Later in the Disclosure Statement Proponents set forth a series of California Public Utility Code Sections, Commission Decisions, Commission Resolutions or Commission Rules that they contend will be superseded by confirmation of the Plan.[2] While State and Commission challenge any preemptive effect of confirmation of the Plan, the particular sections of the Public Utilities Code, Commission rule and Commission decision that the Commission seems most concerned about are the following (with the brief explanation Proponents make in the Disclosure Statement concerning each particular code section, decision and rule):

Public Utilities Code § 377: This section, enacted in January 2001, purports to prohibit the transfer of generating assets to Gen as part of the Plan, and to otherwise require [Commission] authorization of the transfer of those assets under Public Utilities Code § 851.

Public Utilities Code § 451: The [Commission] could interpret this section to conflict with the Bankruptcy Court's establishment of the conditions under which the Reorganized Debtor may resume procurement of the net open position or the transfer of any of [PG & E's] assets or businesses to any of ETrans, GTrans or Gen. To that extent, § 451 would be preempted.

Public Utilities Code § 453: The [Commission] could interpret § 453 to preclude the Reorganized Debtor entering into the power sales agreement with Gen, the transportation and storage services agreement with GTrans, and some or all of the transitional service agreements with ETrans, GTrans and Gen. To that extent, § 453 would be preempted.

Public Utilities Code §§ 816–830: These sections govern the issuance by a public utility of debt or equity securities, among other things requiring the approval of the [Commission] prior to the issuance. These sections are preempted because the Confirmation Order will authorize the issuance of securities and the financings that are required for the Restructuring Transactions and the implementation of the Plan.

Public Utilities Code § 851: This section would require approval of the [Commission] before [PG & E] could 'sell, lease, assign, mortgage, or otherwise dispose of or encumber' its property, including certificates of public convenience and necessity, pursuant to the Plan. The Bankruptcy Court's Confirmation Order would preempt the need for this authorization.

1. Reorganized Debtor is PG & E post-confirmation; ETrans, GTrans, and Gen are limited liability companies to be formed in connection with confirmation of the Plan.

2. Although the Rescheduling Order directed Proponents to describe preempted laws and regulations and the affected governmental units specifically, Proponents simply stated: "See *Exhibit H* to this Disclosure Statement for a list of some of the state agencies and political subdivisions that *may be impacted* by the Plan." Disclosure Statement, 127:18–19 (emphasis added). *"Exhibit I* to this Disclo-

sure Statement lists *some of the laws, regulations and rules of state agencies and subdivisions that are subject to preemption,* along with the relevant agencies." Disclosure Statement, 132:15–17 (emphasis added). In view of the court's decision that Proponents' theory of express preemption must be rejected, and implied preemption applied specifically as to each offending law, the objections by various parties that Proponents did not comply with the precise terms of the Rescheduling Order, although meritorious, will be treated as moot.

[Commission] Resolution L–244: By this Resolution, the [Commission] purported to prohibit [PG & E] from moving its gas transmission assets to FERC jurisdiction under the NGA without express authorization by the [Commission]. The Bankruptcy Court's Confirmation Order would preempt the need for this authorization, even if it were an otherwise lawful requirement. (Footnote omitted.)

[Commission] Gain on Sale 'Rules': Over the years, the [Commission] has issued a number of often-inconsistent decisions assigning or allocating the gain on the sale of public utility property to or between shareholders and ratepayers. To the extent that the [Commission] attempts to apply its gain on sale 'rules' in a manner that results in the application of proceeds from property sold pursuant to the Plan other than as provided for in the Plan or that imputes a 'gain on sale' from the transfer of assets or the other Restructuring Transactions or implementation of the Plan, such action would be preempted. (Footnote omitted.)

D.01–12–017 (December 11, 2001), Ordering Paragraph 5: In this Decision, issued December 11, 2001, the [Commission] attempts to exercise control over [PG & E's] property by purporting to 'reserve[ ] the right to claim a return of the full value of the asset to [PG & E's] ratepayers' should the Bankruptcy Court authorize the transfer of [PG & E's] transmission assets pursuant to the Plan. Inasmuch as this is a direct attempt to interfere with the Plan, this Decision is preempted.

Disclosure Statement, 129:21–131:15.

A core feature of the Plan is referred to by the parties as "disaggregation," meaning PG & E's creation of three new limited liability companies and the separation of all of PG & E's operations primarily into four lines of business based upon PG & E's historical functions: retail gas and electric distribution, to be carried out by Reorganized Debtor; electric transmission, to be carried out by ETrans, LLC ("ETrans"); interstate gas transmission, to be carried out by GTrans, LLC ("GTrans"); and electric generation, to be carried out by Electric Generation, LLC ("Gen", and collectively with ETrans and GTrans, the "LLC's"). Disclosure Statement 6:16–20.

For the disaggregation of the electrical transmission, the Plan contemplates that ETrans and the Proponents:

> shall seek an affirmative ruling of the bankruptcy court, which may be the Confirmation Order, that, pursuant to section 1123 of the Bankruptcy Code, the approval of any California state and local Governmental Entity, including but not limited to, the [Commission], shall not be required in order to, among other things, transfer or operate the ETrans Assets, for the transfer and use of various permits, licenses, leases, and other entitlements in connection with the transfer and operation of the ETrans Assets, to transfer operational control of its transmission facilities ... to issue securities, to assume the ETrans liabilities or to otherwise effectuate the Restructuring Transactions.

Plan, 60:24–61:4.[3]

As shown above, Proponents want the Plan to preempt the Commission's "gain on sale" rules. As a condition precedent to confirmation of the Plan, the Plan requires this court to enter an order prohibiting officials of the Commission and officials of the State "... from taking any action related to the allocation or other treatment of 'gain on sale' related to assets

---

**3.** Comparable language appears for the transactions involving Reorganized Debtor (Plan, 72:10–18), Gen (Plan, 66:13–22) and GTrans (Plan, 63:11–18).

transferred or disposed of under the Plan that would adversely impact the Reorganized Debtor."[4] In their response to the preemption and sovereign immunity objections, Proponents concede that the relief sought in connection with the "gain on sale" rules are in the nature of an injunction. At the same time, Proponents have indicated that even that injunctive provision would be amended, and thus be limited to seeking declaratory relief only. For purposes of the present analysis, however, the court will assume that Proponents desire confirmation to constitute an injunction against enforcement of those rules.[5]

## IV. *Issues*

In order to decide whether to approve or disapprove the Disclosure Statement, the court must answer the following questions.

A. Does the Bankruptcy Code expressly or impliedly preempt California laws so that Proponents may ignore them and seek to obtain confirmation of the Plan?

4. The Disclosure Statement is conspicuously lacking in any detailed information that describes the operation of those rules and how they would affect the post-confirmation activities of the Reorganized Debtor, the LLC's, or any other entity. More information is needed regardless of the ultimate outcome of the sovereign immunity issue if Proponents wish to attempt to preempt those rules.

5. The specific provisions of the Plan which would carry out the preemptive effect of confirmation appear to be the following: Article VII, Implementation Of The Plan, including § 7.1(k)(ii), (as to ETrans), referring to Bankruptcy Code section 1123; § 7.2(i)(ii) (as to ETrans), referring to Bankruptcy Code section 1123; § 7.3(j)(ii) (as to Gen), referring to Bankruptcy Code sections 1123 and 1142(b); § 7.5(n)(iii) (as to Reorganized Debtor), referring to Bankruptcy Code section 1123; and § 7.5(e), prohibiting assumption of the net open position. In Article VIII, Confirmation and Effectiveness of the Plan, the following subparagraphs of § 8.1, Conditions Precedent to Confirmation are noted: (b) declaring that

B. Does sovereign immunity protect the Commission and the State from the declaratory and injunctive relief requested by Proponents in the Plan?[6]

## V. *Discussion*

### A. **Preemption.**

#### 1. **Overview**

In *Baker & Drake, Inc. v. Public Service Commission of Nevada (In re Baker & Drake, Inc.)*, 35 F.3d 1348 (9th Cir.1994) ("*Baker & Drake*"), the Ninth Circuit Court of Appeals quoted Supreme Court authority on preemption:

> "It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with or are contrary to, federal law.'"

*Baker & Drake*, 35 F.3d at 1352, *quoting Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct.

Proponents and their respective affiliates are not liable for Department of Water Resources contracts; (c) prohibiting assignment of the Department of Water Resources contracts; (d) prohibiting assumption of the net open position; (g) prohibiting officials of the Commission and the State from enforcing the "gain on sale" rules; (h) declaring Commission's affiliate transaction rules not applicable; and (i) calling for approval of the Restructuring Transactions as preempted by Bankruptcy Code section 1123.

6. The court conducted an emergency telephone conference with counsel for Proponents, the Commission, the State and others two days prior to the oral argument in this matter. Pursuant to the instructions of the court during that conference, any issue about whether sovereign immunity had been waived was deferred and the question will not be addressed in this Memorandum Decision, notwithstanding the fact that Proponents argued the doctrine of waiver extensively in their written submissions.

2371, 85 L.Ed.2d 714 (1985) (*quoting Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)).

■ "In considering a preemption claim, we look first to the intent and sweep of the federal statute." *Baker & Drake*, 35 F.3d at 1352. More elaborately, the Supreme Court has stated that:

"[t]he purpose of Congress is the ultimate touchstone" in every pre-emption case. As a result, any understanding of the scope of a pre-emption statute must rest primarily on "a fair understanding of *congressional purpose.*" Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the "statutory framework" surrounding it. Also relevant, however, is the "structure and purpose of the statute as a whole," as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485–86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (emphasis in original, citations omitted).

As *Baker & Drake* observed, there are several types of preemption:

The statute's preemptive intent may be either express or implied:

Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within Constitutional limits, Congress is empowered to pre-empt state law by so stating in *express terms.* Absent express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for sup-plementary state regulation. Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that it will be assumed to preclude enforcement of state laws on the same subject."

Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," or *when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."*

*Baker & Drake*, 35 F.3d at 1352–53 (emphasis added), *quoting Hillsborough County*, 471 U.S. at 713, 105 S.Ct. 2371 (citations omitted).

Only the two emphasized types of preemption above are at issue: express preemption and the last category of implied preemption. Proponents have not urged the court to consider the "Congress left no room" and "federal law is so dominant" types of preemption.

■ Express preemption has been defined as "where Congress explicitly defines the extent to which its enactments preempt state law." *Williamson v. General Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000), *cert. denied*, 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247. *See also English v. General Elec. Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) ("Congress can define explicitly the extent to which its enactments pre-empt state law").

Implied preemption was addressed by *Baker & Drake*, which examined whether the state law at issue was an obstacle to the accomplishment and execution of the

full purposes of the bankruptcy laws. *Baker & Drake* reviewed two Supreme Court cases that are critical to this court's analysis of the present controversy: *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), and *Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). *Perez* concluded that the Bankruptcy Code preempted state law that interfered with a discharge in bankruptcy and *Midlantic* acknowledged that the Bankruptcy Code does not preempt state environmental laws or regulations reasonably designed to protect the public health or safety from imminent and identifiable harm. Referring to both decisions, the Ninth Circuit set forth a template which this court finds not only helpful, but controlling in resolving this dispute:

> As we view these cases, they suggest that federal bankruptcy preemption is more likely (1) where a state statute facially or purposefully carves an exception out of the Bankruptcy Code, or (2) where a state statute is concerned with economic regulation rather than with protecting the public health and safety.

*Baker & Drake*, 35 F.3d at 1353. *See also Midlantic*, 474 U.S. at 506 n. 9, 106 S.Ct. 755 and accompanying text.

One of the cases Proponents feature prominently in their argument is *Public Service Company of New Hampshire v. State of New Hampshire (In re Public Service Company of New Hampshire)*, 108 B.R. 854 (1989) ("*PSNH*"). There, the court—years before *Baker & Drake*—stated the same principle:

> However, federal preemption is more likely when the state "police power" involved is "economic regulation rather than health or safety."

*PSNH*, 108 B.R. at 869. The court then cited one of Proponents' counsel in a discussion about preemption under the Commerce Clause of the Constitution:

> State regulations seemingly aimed at furthering public health or safety, or at restraining fraudulent or otherwise unfair trade practices, are less likely to be perceived as "undue burdens on interstate commerce" than are state regulations evidently seeking to maximize the profits of local businesses. Indeed, where the Supreme Court has held that the national interest in the free flow of commerce supersedes a state interest in public safety, it has generally seemed that the challenged statute contributed only marginally if at all to the public safety.

*Id.*, quoting L. Tribe, *American Constitutional Law*, p. 437 (2d ed.1988).

It is important to point out that this court does not read *Baker & Drake* as holding that there can be no preemption of state law except where express preemption appears in the statute. If that were the holding, this matter would be over and the Disclosure Statement would be disapproved. Rather, the court believes there are clear signals in the decision that suggest that there can be implied preemption. First, the above-quoted reference to "economic regulation rather than ... protecting the public health and safety" suggests a balancing test. Next, the court stressed that while there can be a reorganization, it just may be difficult:

> Congress in enacting the Bankruptcy Code was not to mandate that *every company* be reorganized *at all costs*, but rather to establish a preference for reorganizations, where they are *legally feasible and economically practical.*

*Baker & Drake*, 35 F.3d at 1354 (italics in original; emphasis added).

Further, noting that a Nevada statute at issue was promulgated as part of a safety

measure, the court pointed out that if compliance with that statute were to render the debtor financially unable to reorganize, neither it nor the state would be violating any provision of the Bankruptcy Code. But in a footnote the court pointed out that the debtor had not shown that complying with the statute would make a successful reorganization impossible in its case. *Id.*, n. 5. The powerful inference, therefore, is that under appropriate circumstances the state statute could be preempted with a proper showing of what is necessary to make the reorganization possible.

■ One more general principle of preemption is particularly apropos: deference to areas of traditional state regulation.

In all preemption cases, and particularly in those in which Congress has "legislated ... in a field which the States have traditionally occupied," ... we "start with the assumption that the historic police powers of the States were not to be superseded by the [f]ederal [a]ct unless that was the clear and manifest purpose of Congress."

*Medtronic,* 518 U.S. at 484, 116 S.Ct. 2240. *See also CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) ("[A] court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption.").

■ Public utility regulation and environmental regulation are both areas where this deference applies. *See Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Development Com'n,* 461 U.S. 190, 206, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) ("Congress legislated here in a field which the States have traditionally occupied ... so we start with the assumption that the historic police powers of the

States were not to be superseded by the [f]ederal [a]ct unless that was the clear and manifest purpose of Congress"); *Fireman's Fund Ins. Co. v. City of Lodi,* 271 F.3d 911, 932–33 (9th Cir.2002) (as amended) ("we are 'highly deferential' to local legislation in areas such as environmental regulation, which 'traditionally has been a matter of state authority' ") (citation omitted).

With this overview in mind, the court turns to Section 1123(a)(5).[7]

### 2. Preemption under Section 1123(a)(5) generally

#### a. *Language of the Statute*

■ Section 1123(a)(5) provides, in relevant part:

**§ 1123. Contents of Plan**

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(5) provide adequate means for the plan's implementation, such as—

(B) transfer of all or any part of the property of the estate to one or more entities ...

(D) sale of all or any part of the property of the estate, .....

11 U.S.C. § 1123(a)(5)(B) and (D).

Starting with the words of the statute, paragraph (5) of Section 1123(a) says only that the plan shall "provide *adequate means* for the plan's implementation, *such as* [various alternatives]." 11 U.S.C. § 1123(a)(5) (emphasis added). Paragraph (5) can be read simply as a directive to the plan proponent about what must go into the plan. It does not have to be read as an "empowering" statute that, under Proponents' construction, would permit them to do whatever they wanted—"such as"

---

7. Unless otherwise indicated, all Section and Rule references are to the Bankruptcy Code,

11 U.S.C. §§ 101–1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

but not limited to the statutory examples—subject only to the requirements of Section 1129.[8]

This construction—interpreting Paragraph (5) as directive rather than empowering—does not read the "notwithstanding" clause out of the statute. As several parties suggest, that clause still serves a useful purpose by preempting any state law that, for example, would prohibit a party from even submitting a plan to the bankruptcy court without first obtaining approval from a debtor's shareholders. The court can imagine other examples, such as labor laws that might obligate a plan proponent to negotiate in good faith with unions before submitting a plan or corporate laws that would require "a resolution of the board of directors" before a plan could be proposed. 124 Cong. Rec. H11103 (Sept. 28, 1978); S17419 (Oct. 6, 1978) (statement of Senator DeConcini).[9]

Not only is Proponents' reading unnecessary, it leads to absurd results. At the

hearing on January 25, 2002, the court questioned whether under Proponents' reading of Section 1123(a)(5) there would be any limit to what a debtor could do. The court asked counsel about several hypothetical situations, following the Supreme Court's directive to discern "the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic*, 518 U.S. at 486, 116 S.Ct. 2240. The court questioned whether a plan could provide for a debtor to sell liquor to minors (notwithstanding state laws to the contrary), or trade with foreign enemies (notwithstanding federal statutes to the contrary), or dump toxic wastes (notwithstanding environmental laws and Supreme Court precedent), or merge with competitors to create a monopoly or gain some other competitive advantage (in violation of state or federal antitrust laws). There were no satisfactory answers.[10]

---

**8.** Moreover, there is some ambiguity in Congress' use of the words "adequate means" for the plan's implementation. If Congress had meant *"any* means, provided they are adequate,"* it could have said so. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 529 and n. 27, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (rejecting "theoretical elegance" of interpreting statute at highest or lowest level of generality in favor of middle ground "fair understanding of congressional purpose").

**9.** The court is not at all troubled that the above construction involves a relatively minor role for the "notwithstanding" clause as applied to Paragraph (5). *See Medtronic*, 518 U.S. at 484 116 S.Ct. 2240 (even where express preemption is clear, "we must nonetheless 'identify the domain expressly pre-empted'"). That clause does not appear to apply at all to some Paragraphs of Section 1123(a). For example, it is doubtful Congress saw any need to preempt nonbankruptcy laws that might contradict Paragraph (2). That paragraph only requires a plan to "specify any class of claims or interests that is not impaired under the plan." What nonbankruptcy law would contradict that provision? *See*

*also* 11 U.S.C. § 1123(a)(1) (plan shall designate classes) and (a)(3) (plan shall specify treatment of impaired classes). *Compare* 1123(a)(6) (corporate debtors must include in their charter a ban on issuance of nonvoting securities, notwithstanding any contrary nonbankruptcy law) *and* 1123(a)(7) (governing selection of officer, director, or trustee under the plan, notwithstanding any contrary nonbankruptcy law).

**10.** The most offensive plans might be reined in by something like *Midlantic's* limitation on abandonment of toxic wastes. *See Midlantic*, 474 U.S. at 494, 106 S.Ct. 755. That decision, however, arose under Section 554, which does not have the "notwithstanding" clause. *See* 11 U.S.C. § 554. Moreover, *Midlantic* was strictly limited to state laws or regulations reasonably designed to protect the public health or safety from "imminent" and "identifiable" harm. *See Midlantic*, 474 U.S. at 506 n. 9, 106 S.Ct. 755 and accompanying text. The potential harm from antitrust violations, for example, might not be imminent and clearly identifiable, but the court does not believe Congress intended to eviscerate all

■ Taken in context, Section 1123 looks more like a component of Congress' roadmap that heads towards confirmation. First, Subchapter II of Chapter 11, entitled "The Plan," begins by stating by whom and when plans may be filed (Section 1121. Who may file a plan); then directs how a plan is to position creditors and owners (Section 1122. Classification of claims or interests); next prescribes what goes into a plan (Section 1123. Contents of plan). That section, and in particular its internal structure, is a "blueprint" the plan proponent is to follow when constructing what has been characterized as resembling a contract. *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Association*, 997 F.2d 581, 588 (9th Cir.1993) ("A reorganization plan resembles a consent decree and therefore, should be construed basically as a contract.")

The mandatory rules Congress has established for that contract include the designation of classes of claims or interests (Section 1123(a)(1)); the designation of not impaired classes of claims or interests (Section 1123(a)(2)); the treatment of impaired classes of claims or interests (Section 1123(a)(3)); equal treatment of classes, unless members agree otherwise (Section 1123(a)(4)); adequate means for implementation (Section 1123(a)(5)); corporate charter provisions (Section 1123(a)(6)); and provisions consistent with public policy for selection of officers, directors and trustees (Section 1123(a)(7)).

■ A plan that lacks any of these seven components (except where one or more may be inapplicable) is structurally defec-

tive because the "shall" directive of Section 1123(a) has not been satisfied.[11]

In view of the scant legislative history about Section 1123 discussed, *infra*, it is apparent that that section is largely a carryover from its counterparts under the former Bankruptcy Act. Section 91 of that Act (former 11 U.S.C. § 91) described provisions a Chapter IX petitioner "may include" in a plan (provisions modifying or altering rights of creditors generally; other provisions not inconsistent with Chapter IX; provisions for rejection of executory contracts or unexpired leases). Section 216 of the Bankruptcy Act (former 11 U.S.C. § 616) contained nine subparagraphs beginning with "shall include in," "shall provide for," or "shall specify." Five subparagraphs provided that the plan "may" deal with, provide for, or include other provisions.[12]

In Chapter XI, Bankruptcy Act Section 356 (former 11 U.S.C. § 756) required inclusion of provisions dealing with unsecured creditors ("An arrangement [Bankruptcy Act practitioners will recall the phrase "plan of arrangement" in Chapter XI practice] within the meaning of this chapter shall include provisions modifying or altering the rights of unsecured creditors generally or some class of them, upon any terms or for any consideration.") Then Bankruptcy Act Section 357 (former 11 U.S.C. § 757) set forth eight subparagraphs specifying provisions an arrangement "may include."

Finally in Chapter XII, Bankruptcy Act Section 461 (former 11 U.S.C. § 861) resembled Section 216 (in Chapter X) and set forth seven "shall" include, provide or

---

antitrust laws for debtors in bankruptcy (especially solvent debtors). In other words, *Midlantic* does not cure the problems with Proponents' reading of the statute.

**11.** In Section 1123(b) Congress has given plan proponents various options that a plan

*may* contain. Those options are not relevant to this discussion.

**12.** *See* footnote 15, *infra,* and accompanying text.

specify subparagraphs and six "may" subparagraphs.

Under the Bankruptcy Act there was no counterpart to today's disclosure statement. Now in Section 1125 Congress has directed that adequate information be provided that would enable a hypothetical investor typical of holders of claims or interests of a relevant class to make an informed judgment about the plan. In practice it is in the disclosure statement that plan proponents set forth a description of their business, the reasons for their financial difficulties, historical and current financial information, material post-petition events, a summary of assets and liabilities, a description of the plan, and perhaps most importantly, a means for effectuating the plan.[13]

This court is convinced that the contents of the plan's provisions, and in particular those found in Section 1123(a)(5), are derived from the Bankruptcy Act that required the plan to tell creditors what they were going to get and how they were going to get it. That is still the purpose of the section.

From the foregoing the court rejects the notion that Congress, without a hint in the legislative history, in a section of the Bankruptcy Code entitled "Contents Of Plan," and using words calling for "adequate means for the Plan's implementation," intended to permit a debtor's plan-confirmed by a bankruptcy judge (not by a legislative act, as in most preemption situations)[14]—to obliterate a whole area of jurisdiction and authority traditionally left to state law. If the *PSNH* court thought this was a simple matter of "plain meaning" (*PSNH*, 108 B.R. at 874–879), that interpretation was a far cry from its observation only a few months earlier, that there was an

> ... ambiguity left in the statute by Congress in the enactment of the 1978 Code. Bankruptcy Code §§ 1123(a)(5); 1129(a)(3) and 1129(a)(6).

*Public Service*, 99 B.R. at 509.

### b. Legislative History of Section 1123

Proponents contend that by inserting the clause "notwithstanding any otherwise applicable law" into Section 1123, Congress expressly exempted all state laws inconsistent with what a plan proposes and a court chooses to confirm. Nothing in the legislative history of Section 1123, however, indicates that its drafters intended for state law to be so expansively preempted. To the contrary, the absence of any meaningful discussion regarding the purpose and consequences of the clause demonstrates that Congress did not draft Section 1123 as a blanket preemption of state law.

Section 1123(a), as initially enacted, did not state that its provisions were applicable "notwithstanding any otherwise applicable nonbankruptcy law." The legislative history of Section 1123 does not indicate that its provisions preempt state law; rather, the legislative history suggests that Section 1123 is derived from Section 216[15]

---

**13.** For example, the United States Trustee's Guidelines For Region 17 (covering this district) include a requirement that the disclosure statement include:

(j) MEANS OF EFFECTUATING THE PLAN: The statement should include how the goals of the plan are to be accomplished, *e.g.*, infusion of cash by an investor, sale of real or personal property, continued business operations, or issuance of stock.

If an investor is to provide funds, financial information about the investor should be included.

**14.** *See, i.e., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988).

**15.** Section 216 of the Bankruptcy Act did not contain any provision preempting state law.

of the Bankruptcy Act (also known as the Bankruptcy Statute of 1898). The House Report pertaining to the Bankruptcy Reform Act of 1978 states that, with respect to sections 1123(a)(5):

> Subsection (a) specifies the matter that a plan of reorganization must contain.... Paragraph (4) [now paragraph (5)] of subsection (a) is derived from section 216 of current law, with some modifications. It requires the plan to provide adequate means for the plan's execution. These means may include retention by the debtor of all or any part of the property of the estate, transfer of all or any part of the property of the estate to one or more entities, whether organized pre- or postconfirmation, merger or consolidation of the debtor with one or more persons, sale and distribution of all or any part of the property of the estate, satisfaction or modification of any lien, cancellation or modification of any indenture or similar instrument, curing or waiving of any default, extension of maturity dates or change in interest rates of securities, amendment of the debtor's charter, and issuance of securities.

H.R. Rep. 95–595, 1978 U.S.C.C.A.N. 5963, 6363, 95th Cong., 1st Sess.1977 (Sept. 8, 1977). The foregoing legislative history of section 1123, as initially enacted, does not indicate that it preempts state law.

In 1980, Congress amended Section 1123(a) to add the phrase "[n]otwithstanding any otherwise applicable nonbankruptcy law." Despite this change, the legislative history accompanying the amendment states that "This amendment makes it clear that the rules governing what is contained in the reorganization plan are those specified in this section; deletes a redundant word; and makes several stylistic changes." H.R. Rep. 96–1195, at 22, 122–23, 96th Cong., 2d Sess.1980 (July 25, 1980). If the words "notwithstanding otherwise applicable nonbankruptcy law" meant that a debtor could propose a plan contrary to any law, Congress would not have treated the amendment as merely "stylistic." More importantly, the observation that the amendment "makes it clear that the rules governing what is contained in the reorganization plan are those specified in this section" indicates that this section (and no other law) governs what is to be placed into a plan of reorganization.[16] It does not indicate that whatever is placed into a plan of reorganization preempts state law. The legislative history of Section 1123(a) simply does not support the

Subsection 216(10) (the subsection from which section 1123(a)(5) is derived) provided:

A plan of reorganization under this chapter—

\* \* \*

... shall provide adequate means for the execution of the plan, which may include: the retention by the debtor of all or any part of its property; the sale or transfer of all of or any part of its property to one or more other corporations theretofore organized or thereafter to be organized; the merger or consolidation of the debtor with one or more other corporations; the sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein; the satisfaction or modification of liens; the cancellation or modification of indentures or of other similar instruments; the curing or waiver of defaults; the extension of maturity dates and changes in interest rates and other terms of outstanding securities; the amendment of the charter of the debtor; the issuance of securities of the debtor or such other corporations for cash, for property, in exchange for existing securities, in satisfaction of claims or stock or for other appropriate purposes....

16. This phrase further supports this court's conclusion that Section 1123(a)(5) is a directive as opposed to an empowering statute.

revolutionary significance that PG & E attributes to the amendment.

### c. *Case Law*

Proponents cite several cases in support of their reading of Section 1123(a), and they point out that parties opposing the Plan have cited no case to the contrary. Proponents' cases, however, are all distinguishable.

Proponents' two leading cases are *PSNH* and *Universal Cooperatives, Inc. v. FCX, Inc. (In re FCX, Inc.)*, 853 F.2d 1149 (4th Cir.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989) (*"FCX"*). In *PSNH* the proposed plan of reorganization was very similar to Proponents' Plan. It involved:

> the proposed use of § 1123(a)(5) of the [Bankruptcy] Code to authorize transfer of assets and restructuring of entities [of the public utility therein, PSNH,] in such a fashion as would result in transfer of regulatory jurisdiction over the debtor and its rates from the New Hampshire Public Utilities Commission ["NHPUC"] to the Federal Energy Regulatory Commission ["FERC".]

*PSNH,* 108 B.R. at 857 (quoting court's earlier order).

The State of New Hampshire apparently opposed PSNH's plan because moving into federal jurisdiction

would enable PSNH to recover much of its investment in the Seabrook nuclear power plant even before Seabrook operates[,] in contrast to what state law would allow before operation under the "Anti CWIP" law in New Hampshire. *PSNH,* 108 B.R. at 860 (footnotes omitted).

█ In this context the *PSNH* court conducted a scholarly, thorough and helpful analysis of the legislative history and statutory framework. Focusing on the history of Section 1129(a)(6), the *PSNH* court noted that "prior to 1978 public utilities had to have public utility commission approval for plans of reorganization." *Id.* at 863. Then, with the adoption of the Bankruptcy Reform Act of 1978, regulatory approval was explicitly required for reorganizations involving railroads and municipalities, but no such explicit requirement applied to non-railroad reorganizations under chapter 11 except that Section 1129(a)(6) requires regulators' approval for any change in rates. *See* 11 U.S.C. § 943(b)(6) (municipalities), § 1129(a)(6) (rates), § 1172(b) (railroads), *and PSNH,* 108 B.R. at 864–66. Considering this history and its reading of Section 1123(a)(5) as an "empowering" statute, the *PSNH* court held that NHPUC did not have an absolute "veto" power over PSNH's plan of reorganization. *Id.* at 883 and 891.[17]

---

**17.** The *PSNH* court stated:

> In my opinion, the reorganization process of chapter 11 cannot work—in the way that Congress envisioned under the drastic overhaul of the reorganization chapters in the 1978 Act [*i.e.,* when it removed the veto power of public utility commissions from Chapter 11 cases generally]—if one party in interest has an effective veto over the necessary restructuring to implement a plan *and* the reorganization court no longer has an early and direct role in plan formulation and approval.

*PSNH,* 108 B.R. at 891 (emphasis in original).

After the *PSNH* decision, Congress considered amending Section 1129(a)(6). As summarized by the legislative history, the amendment would have provided that electric utilities would need state regulators' approval not only for confirmation of any plan but also to "take any other action pertaining to the debtor that would terminate or restrict the existing jurisdiction of the state regulatory authority." H.R. Rep. 101–1015, at 43, 1991 W.L. 4376 (Leg.Hist.), 101st Cong., 2d Sess.1990 (Jan. 3, 1991).

Congress did not enact this absolute veto power. If Congress' failure to act has any

The *PSNH* decision relies on express preemption, which has been rejected above. Nevertheless, as an alternative basis for its conclusion *PSNH* relies on implied preemption, and its analysis appears generally consistent with *Baker & Drake's* observation that federal bankruptcy preemption is more likely "where a state statute is concerned with economic regulation rather than with protecting the public health and safety." *Baker & Drake*, 35 F.3d at 1353.[18]

According to *PSNH:* (1) the State of New Hampshire's concerns were purely economic not health or safety (*PSNH*, 108 B.R. at 890), (2) "the inescapable result of the State's position is that *no* plan can be confirmed in this case unless it is approved by the [NHPUC]" (*id.* at 861, emphasis in original),[19] (3) the consequent jurisdictional "stalemate" would be inimical to the "prompt and orderly processes necessary to an effective reorganization 'before the patient dies'" (*id.* at 856 n. 1, 890 and 891), and (4) the Bankruptcy Code "would seem to indicate" a preemptive intent as to "restructuring provisions of a chapter 11 plan of reorganization" (an express intent, according to *PSNH* ) (*id.* at 882).[20] The

*PSNH* court specifically reserved some issues for the hearing on plan confirmation:

1. Those aspects of the debtor's plan of reorganization ... or any amended plan containing similar provisions ... that are *necessary and required* to effectuate the "restructuring" of the debtor into a reorganized entity or entities capable of achieving a feasible reorganization, subject to the confirmation requirements of § 1129 of the Bankruptcy Code, and are actions specifically covered by § 1123(a)(5) of the Bankruptcy Code, may be approved as part of confirmation ... notwithstanding any otherwise applicable law that would require approval of such actions by the New Hampshire Public Utilities Commission.

\* \* \*

3. Whether such restructuring is *necessary and required* for a feasible reorganization will be a § 1129 issue....

4. .... the effect on the *public interest* of such a plan arguably will be one of the factors to be considered at confirmation....

*PSNH*, 108 B.R. at 892–893 (Appendix ¶¶ 1, 3 and 4) (emphasis added).

---

weight at all, it is entirely consistent with the disposition herein. The Bankruptcy Code neither gives an absolute preemption power to Proponents nor an absolute veto power to the State and the Commission. Rather, each alleged instance of implied preemption must be tested to determine whether the particular state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Baker & Drake*, 35 F.3d at 1353 (citation omitted).

18. It is noteworthy that, having decided that express preemption pertains, the court in *PSNH* immediately qualified the so-called unconditional preemption:

In terms of the literal language of § 1123(a)(5) it seems obvious that the section on its face contemplates that restruc-

turing transactions *necessary* to a plan of reorganization may be provided....
*PSNH*, 108 B.R. at 881 (emphasis added).
Since there is nothing in the statute about "necessary" it seems the court was really considering implied—or better yet "applied"—preemption.

19. "[If] the PUC has the last say about everything, we may as well close up our tents and send it over to the PUC, let them reorganize this company and when they have approved it, send it over and I'll sign it." *PSNH*, 108 B.R. at 887 (quoting hearing transcript).

20. According to the *PSNH* court, the State of New Hampshire "does not really argue to the contrary." *PSNH*, 108 B.R. at 882. Here the State and the Commission do!

The *PSNH* decision emphasized that "the issue is a narrower one than may first appear." *Id.* at 861. The essential holding of *PSNH* is only that the Bankruptcy Code preempts the public utility commission's absolute "veto" power over a bankruptcy restructuring. The *PSNH* decision noted that, ironically, the bankruptcy restructuring might have been "essential to restoring the enterprise to financial health so it *can* then comply with ongoing regulatory requirements." *Id.* at 890 n. 38 and 891 (emphasis in original). Moreover, the *PSNH* court emphasized that there was no preemption of such ongoing regulatory requirements:

> Nothing in § 1123 or § 1129 of the Bankruptcy Code has the effect of exempting the reorganized entity or entities under a confirmed plan of reorganization from any ongoing applicable regulatory requirements by NHPUC as to the future operations of said entity or entities (save for any questioning of the restructuring itself) once the restructuring necessary and required for a feasible reorganization has been effectuated as part of a confirmed plan of reorganization.

*PSNH*, 108 B.R. at 893 (Appendix ¶ 5).

The *PSNH* court acknowledged that NHPUC might lose its rate-setting jurisdiction over some reorganized entities because they would come under FERC jurisdiction,

> [but] the argument that "Congress didn't intend to take rate-setting authority from the states" by § 1123 of the Bankruptcy Code is simply misplaced. Congress already considered the public interest when it withdrew considerable regulatory authority from the states in its FERC legislation, as affirmed in the preemption decision by the Supreme Court in *Mississippi Power & Light v.*

*State of Mississippi*, 487 U.S. 354[, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988)]. . . .

> Like it or not, Congress has decreed that local rates *can* be determined by FERC. . . . Congress apparently believes that regional requirements and regulation sometimes have to override local state requirements to have a rational power supply system in the country.

*PSNH*, 108 B.R. at 872 (footnotes omitted).

The court does not disagree with most of the *PSNH* analysis. Although the court cannot agree that Section 1123(a)(5) is an "empowering" statute that explicitly preempts or overrides all contrary non-bankruptcy law, the court agrees that restructuring generally is a proper purpose of chapter 11 and that the Bankruptcy Code would seem to indicate at least some preemptive intent in favor of restructuring, which would preempt a state regulator's absolute veto power over bankruptcy restructuring. *See PSNH*, 108 B.R. at 882. To the extent that *PSNH* implies a broader preemption, it may be factually distinguishable because (a) any economic need for PG & E to disaggregate is not immediately obvious, unlike in *PSNH*, and (b) the objecting parties in this case advance some non-economic concerns, unlike the State of New Hampshire in *PSNH*. *See Baker & Drake*, 35 F.3d at 1353 (bankruptcy preemption more likely for economic regulation rather than public health and safety).

No evidence exists at this stage in the reorganization process whether PG & E has an economic need to disaggregate. In *PSNH*, unlike this case, the court questioned the debtor's solvency and emphasized the need to reorganize "before the patient dies." *PSNH*, 108 B.R. at 856 n. 1, 890 n. 38, and 891. The Proponents and the Committee have suggested that there

is some economic need to disaggregate because the financial markets effectively may require it.[21] The court agrees with *PSNH*, however, that "[w]hether such restructuring is necessary and required for a feasible reorganization will be a § 1129 issue." *PSNH*, 108 B.R. at 892, Appendix ¶ 3. Preemption and feasibility can be addressed in that context, but only after further elaboration in a revised Disclosure Statement.

■ As to non-economic considerations, the State, the Commission and other objectors have argued that Proponents are abusing the bankruptcy process to escape the Commission's jurisdiction. To the extent that this is a "facial invalidity" objection the court rejects it. Using bankruptcy reorganization to move from state regulation to federal regulation is not necessarily improper. Proponents have argued without dispute that there is nothing illegal about a disaggregated utility structure, and that if PG & E had founded its business as several separate entities, or if another entity did so now, those entities would be outside the Commission's jurisdiction to the same extent as proposed under the Plan. Moreover, among the purposes of the Bankruptcy Code is giving debtors a fresh start. *Perez*, 402 U.S. at 649, 91 S.Ct. 1704. Applied to corporate debtors the fresh start might entail restructuring their business. The court believes, however,

that for Proponents to preempt state law barring disaggregation, they will need to rely on more than just the general policy of Chapter 11 favoring reorganizations. They must show that enforcing such state law would be an "obstacle to the accomplishment and execution of the full purposes of the bankruptcy laws." *Baker & Drake*, 35 F.3d at 1353. The court does not presently decide whether Proponents must show that disaggregation is necessary to pay past debts, or to avoid incurring future significant debts, or any other standard. These are matters to be shown in general in a revised Disclosure Statement, and to be proven at trial.

■ Another non-economic consideration raised by several objectors is that there are potential environmental impacts from disaggregation.[22] How disaggregation itself would have any adverse environmental impact is not immediately obvious. As Proponents point out, the disaggregated entities will still be subject to all the usual zoning and environmental regulations. The objectors argue, however, that disaggregation will remove some lands from the Commission's jurisdiction, that FERC has previously defined its mandate to exclude environmental concerns, that even if FERC were to consider environmental issues most of PG & E's current land holdings will not be subject to either the Commission's or FERC's jurisdiction, and that under California law this would

---

**21.** Apparently the Proponents and the Committee believe that PG & E's creditors will need to be paid over time, that this requires debt securities, and that the debt securities will not be acceptable to the financial markets, or perhaps will not trade at par, unless PG & E's business is removed to some extent from the Commission's jurisdiction by disaggregation. The court makes no determination on these issues.

**22.** It is not clear that environmental impacts are matters of public "safety" or even public

"health," although at some point environmental degradation no doubt would have serious health consequences for some or all of us. As noted above, however, preemption is particularly unlikely for environmental matters. *Midlantic*, 474 U.S. 494, 106 S.Ct. 755; *Fireman's Fund*, 271 F.3d at 932–933 ("highly deferential" to local environmental regulation). *See also Baker & Drake*, 35 F.3d at 1354 (noting non-economic purposes of state regulation other than health and safety).

be sufficient to block PG & E's proposed disaggregation or perhaps condition it on some level of environmental commitments.[23] The court finds merit in both arguments. The court agrees with *PSNH* that Proponents would have a more difficult preemption argument if they intended to block "ongoing regulatory requirements." *PSNH* 108 B.R. at 890 n. 38, 891 and 893 (Appendix ¶ 5). On the other hand, the court rejects any argument that preemption is less serious because conceptually it occurs only at the instant of disaggregation. Proponents attempt to distinguish *Baker & Drake* by arguing that there the Nevada law on point did not impede the event of reorganization, but only the post-confirmation operations of the reorganized debtor. Here they emphasize that once the Plan is confirmed and becomes effective, Reorganized Debtor, the LLC's and all other affiliated entities will comply fully with applicable law just as PG & E is doing now as required by 28 U.S.C. § 959(b). Their theory is that only a single event—what their counsel calls the "big-bang" of confirmation—will be exempt from state law that would otherwise prohibit the Restructuring Transactions. The court rejects this theory. State law applies, or it is preempted. It is not a temporal thing, suspended only for a moment. Therefore, the environmental objections do not render the Plan facially unconfirmable but they may be relevant to preemption issues at the confirmation hearing.

In sum, the court cannot agree with *PSNH* to the extent it suggests a sweeping mandate to preempt whatever plan proponents (and perhaps a single bankruptcy judge) decide should be preempted. The court has found no other cases that suggest such an open-ended preemption. Rather, in all those cases the scope of preemption is limited either by the description of the law being displaced or by the nature of the preemptive statute.

Proponents' other leading case is *FCX*. *FCX* held that state law restrictions on the surrender of collateral known as "patronage certificates" were preempted by the Bankruptcy Code. *FCX*, 853 F.2d 1149. In distinguishing a decision that reached the opposite conclusion (*Calvert v. Bongards Creameries (In re Schauer)*, 62 B.R. 526 (Bankr.D.Minn.1986), *aff'd*, 835 F.2d 1222 (8th Cir.1987)), *FCX* stated:

> *In re Schauer*, however, is distinguishable on two grounds. First, the trustee there did not rely on § 1123(a)(5)(D), but [instead on] § 363(b)(1) and § 704.... Second, and more importantly, § 363(b)(1) and § 704 are substantively different from § 1123(a)(5)(D) .... § 363(b)(1) and § 704 are no more than "enabling statutes that give the trustee the authority to sell or dispose of

23. The Plan and Disclosure Statement include assurances that PG & E, the LLCs and Land Holdings (another entity to be formed by Proponents after confirmation) will remain subject to any applicable environmental laws and regulations and that Proponents have no intention of changing their environmental policies and standards. *See* Plan § 7.8 ("Regulatory Issues") at 74:5–9 and Disclosure Statement §§ VI.D.4 ("Land Ownership") and L. ("Regulatory Impact of the Plan") at 99:1–3 and 126:16–127.19. The court notes that these commitments do not necessarily bar all development of all land forever, nor is

it clear that they must do so to comply with state law. Unlike most other land-holders PG & E has been subject to additional restrictions because of the Commission's jurisdiction over it. The Commission has argued that this is appropriate because, as part of the "regulatory compact," California ratepayers subsidized PG & E's acquisition and non-development of its land. The merits of this argument are not before the court, and the issue is described here only to clarify that the alleged environmental consequences of disaggregation do not render the Plan facially unconfirmable.

property if the debtor[ ] would have had the same right under state law." ...

In contrast, § 1123(a)(5) is an empowering statute. As stated by Collier: "The alternatives set forth in § 1123(a)(5) are self executing. That is, the plan may propose such actions notwithstanding nonbankruptcy law or agreements." 5 *Collier on Bankruptcy* ¶ 1123.01, at 1123–10. Section 1123(a)(5)(D) then does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights, thus enhancing the ability of a trustee or debtor in possession to deal with property of the estate. *FCX,* 853 F.2d at 1154–55.[24]

The court disagrees with *FCX* to the extent, if any, that it supports an unfettered right to dispose of assets without regard to state law as part of a plan pursuant to Section 1123(a)(5)(D). The court in *FCX* was not faced with anything similar to relief sought by Proponents in this case, and did not discuss the ramifications of such a reading. In fact, the debtor did not even seek to sell or transfer the

patronage certificates to a third party. It proposed—and was allowed—to force a creditor to accept collateral in violation of that creditor's own articles of incorporation. *FCX,* 853 F.2d at 1149.

In addition, the court notes that debtors are already empowered to sell property, notwithstanding some nonbankruptcy laws, pursuant to Sections 363(f) and 1129(b)(2)(A)(ii). Those sections have carefully worked-out limitations on sales (such as requiring that any liens attach to the proceeds of sale and that sales be subject to credit bids). *See* 11 U.S.C. §§ 363(f) and 1129(b)(2)(A)(ii). Therefore, it is not necessary to rely on Section 1123(a)(5)(D) as an empowering statute for any sales of the type that Congress explicitly authorized. Moreover, even if Section 1123(a)(5)(D) were an empowering statute, it would be inappropriate to interpret it in such a way as to ignore the carefully limited powers in Sections 363(f) and 1129(b)(2)(A)(ii).[25]

The *PSNH* decision states that "*FCX* apparently is the only case that has any meaningful discussion of the provisions of

---

**24.** The *Collier* treatise provides no analysis or discussion of the issues and simply cites a few cases that also have no meaningful discussion for present purposes. *See also PSNH,* 108 B.R. at 883 n. 25 (no meaningful discussion in cases other than *FCX* ).

**25.** The court notes that other sections of the Bankruptcy Code, or nonbankruptcy law, appear to be more appropriately tailored sources of empowerment for the other paragraphs of Section 1123(a)(5). For example, Paragraph (G) of Section 1123(a)(5) suggests that one means of implementing a plan is to provide for "curing or waiving a default." 11 U.S.C. § 1123(a)(5)(G). The curing and waiving powers are covered either by Section 1129(a)(8)(A) (class accepts a plan, thereby waiving defaults) or Section 1129(a)(8)(B) (class is unimpaired because defaults are cured). Moreover, those powers are more precisely tailored to this purpose: Sections 1124(2)(A) and 365(b)(2)(D) specify that the

"cure" need not include, for example, any "penalty rate." *See* 11 U.S.C. §§ 365(b)(2)(D), 1124(2)(A), and 1129(a)(8)(B).

Another example is that Paragraph (H) of Section 1123(a)(5) provides for "extension of a maturity date or a change in an interest rate or other term of outstanding securities." 11 U.S.C. § 1123(a)(5)(H). These powers are covered by Sections 506(b), 1129(a)(7), 1129(a)(8)(A) and 1129(b)(2)(B), which collectively tailor such powers to assure that the interest rate provides adequate present value, or else that the affected class consents or no junior class receives or retains anything under the plan on account of their claims or interests.

Similarly, nonbankruptcy law such as state and federal antitrust laws may place carefully tailored limits on mergers under Paragraph (C) of Section 1123(a)(5).

1123(a)(5) for present purposes." *PSNH,* 108 B.R. at 883 n. 25. Proponents have not cited any other case.[26] Therefore, the applicable cases reinforce the court's view, based on the statutory language, that Section 1123(a)(5) does not empower Proponents to engage in wholesale preemption of nonbankruptcy law through their Plan. For all of these reasons, Proponents' reliance on *PSNH* and *FCX* is insufficient to justify the full scope of relief they seek. At this stage, however, the court cannot say as a matter of law that Proponents will be unable to establish implied preemption of otherwise applicable state laws at the confirmation hearings.

### d. *Other Bankruptcy Preemption Statutes*

Here, Proponents urge this court to adopt an interpretation of Section 1123(a)(5) that would allow plans and orders confirming plans—the terms of which are not codified or even known until a plan and disclosure statement are filed—to preempt all state law. Generally, unlike Proponents' interpretation of Section 1123(a)(5), other portions of the Bankruptcy Code which preempt state law are self-limiting in scope. In other words, the provisions explicitly describe and set the parameters of state law being exempted, or specifically set forth the nature and scope of the statutory bankruptcy law which preempts the state law. They do not contemplate having parties and the court "make" the preemptive law.

For example, Section 1125(d) provides that a bankruptcy court's determination regarding the adequacy of a disclosure statement is not governed by otherwise applicable non-bankruptcy law. The preemption is not open-ended. Similarly, Section 1124(2) provides that, notwithstanding any law that entitles a claim or interest to receive accelerated payment upon default, a plan may cure the default and reinstate the maturity of the claim or interest. *See Entz–White,* 850 F.2d 1338. The statute specifically defines the nature of those state laws being preempted.

Likewise, Section 1142(a) defines the type of state law being pre-empted: those laws relating to financial condition. Section 1142(a) provides that "notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition," the debtor or reorganized entity shall carry out the plan and shall comply with orders of the court. Section 1145, which pertains to specified offers or sales of securities under a plan, exempts (with certain exceptions) debtors and plan proponents from complying with state and local laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in a security.

Section 541(c)(1) provides that an ("interest of the debtor in property becomes property of the estate ... notwithstanding any provision in ... applicable nonbankruptcy law" that restricts the transfer of such interest or that is conditioned on the insolvency or financial condition of the

---

**26.** *Cf. Great Western Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber and Supply, Inc.),* 850 F.2d 1338, 1340 n. 3 (9th Cir.1988) (holding that debtor is entitled to cure default using pre-maturity interest rate pursuant to Section 1124(2), but commenting in dicta that Section 1123 "would appear to allow debtors to cure this type of default even if a party with a claim cured in this way would be impaired under § 1124") and *Citybank v. Udhus (In re Udhus),* 218 B.R. 513 (9th Cir. BAP 1998) (concept of "cure" used throughout bankruptcy code nullifies default, so cure referred to in Section 1123(a)(5)(G) does not require payment of default interest even where creditor is impaired).

debtor. Section 363(*l*) provides that a trustee may sell, use or lease property "notwithstanding any provision ... in applicable law that is conditioned on the insolvency or financial condition of the debtor ...". Section 365(e)(1) and (f)(3) allow a trustee to assume or assign leases and executory contracts notwithstanding otherwise applicable law that purports to terminate the contract upon such an assumption or which purports to terminate the contract due to the financial condition of the debtor. Section 545 allows a trustee to avoid the fixing of certain statutory liens. Section 546(c) places limitations on a seller's statutory right to reclaim goods.

In each of these cases, the scope of the preemption is limited either by the description of the law being displaced or by the nature of the preemptive bankruptcy statute. None of these provisions allows a plan or order or law of undefined scope to preempt any and all laws inconsistent with its provisions.

#### e. *Conclusion as to Section 1123(a)(5)*

For the foregoing reasons, the court rejects Proponents' interpretation of Section 1123(a)(5) as allowing it to disaggregate with unfettered preemption of any contrary nonbankruptcy law. The scope of preemption, if any, must be considered in light of the nonbankruptcy laws at issue.

### 3. Necessary Modifications To Disclosure Statement

At the beginning of this Memorandum Decision the court reminded Proponents that the Rescheduling Order directed them to describe specifically laws they sought to preempt and the governmental units affected by such preemption. Now that the matter has been fully briefed, argued and analyzed, and Proponents' express preemption theory rejected, the court believes it appropriate to expand upon the Rescheduling Order and give Proponents some direction as to minimum disclosures necessary to set the stage for their implied preemption confirmation contest.

It would be burdensome, of course, to require Proponents to fill a revised Disclosure Statement with a detailed explanation of each and every law, regulation, decision, ruling, ordinance or other authority Proponents believe stand in the way of confirmation, and further to require Proponents to set forth their entire evidentiary support for their position. That being said, the court will require Proponents to state in summary fashion the reasons why they believe it necessary for each of the Public Utilities Code sections referenced in section III, the gain on sale rules, and Ordering Paragraph 5 of Commission Decision D.01–12–017, to be preempted. Proponents do not need to include specific details at this time. It is sufficient if they prepare the revised disclosures as they would prepare a trial brief, showing what ultimate facts will be proven to lead the court to find that the application of those laws to the facts of PG & E's proposed reorganization are economic in nature rather than directed at protecting public safety or other noneconomic concerns, and that those particular laws stand as an obstacle to the accomplishment and execution of the purposes and objectives of Congress and the Bankruptcy Code.

### B. Sovereign Immunity Implications

█ 1. As noted in Section III, several provisions of the Plan seek an affirmative ruling of this court under Section 1123 that approval of various state and local governmental units is not required to carry out many of the contemplated transactions. The Plan also seeks an injunction prohibiting members of the Commission

and officials of the State from taking certain actions.[27]

■ In addition, the Plan seeks to exempt PG & E from its statutory obligation to fund the net open position to provide sufficient electric power to serve the public. The Commission argues that this constitutes an attempt to recover money from the State. That duty includes purchasing and paying for power from wholesale suppliers when the demand for power by ratepayers exceeds the utility's own generation capacity. Whether or not the State is obligated to pay for power purchased by the California Department of Water Resources to cover PG & E's net open position, the Plan—while it may attempt to prevent PG & E from having to pay certain amounts of money—does not constitute an impermissible attempt to recover money from the State. This is much different from Proponents' attempt to have the Plan prohibit the Reorganized Debtor from assuming the net open position or prohibiting the Reorganized Debtor from accepting, directly or indirectly, an assignment of Department of Water Resources contracts. For the Plan to restrain the Reorganized Debtor from doing such things is the functional equivalent of having the Plan declare that the Reorganized Debtor does not have to comply with certain applicable provisions of nonbankruptcy law. These matters are dealt with in the court's decision concerning implied preemption, supra.

■ The Plan seeks equitable and injunctive relief. As such it constitutes "... the prosecution, or pursuit, of some claim, demand, or request." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 407, 5 L.Ed. 257 (1821). More recently than the early 1800s, the Ninth Circuit held that suits requesting nonmonetary relief do not divest the state of its immunity. *Mitchell v. Franchise Tax Board (In re Mitchell),* 209 F.3d 1111, 1116 (9th Cir.2000), quoting *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("The Eleventh Amendment does not exist solely in order to prevent federal court judgments that must be paid out of a State's treasury"). In *Mitchell,* the bankruptcy court, the Bankruptcy Appellate Panel[28] and the Ninth Circuit determined an adversary proceeding commenced by a debtor to be a "suit" for Eleventh Amendment purposes. And in *NVR Homes, Inc. v. Clerks of the Circuit Courts (In re NVR, LP),* 189 F.3d 442 (4th Cir.1999), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 815 (2000), the court extended the application of this principle to a contested matter commenced against state agencies by motion under Fed. R. Bankr.P. 9014. Rule 7001(7) takes out of the definition of "adversary proceeding" a proceeding to obtain an injunction or other equitable relief when a Chapter 11 plan provides for such relief. But permitting such relief without an adversary proceeding does not change the result for

---

**27.** Apart from the sovereign immunity issues discussed in this Memorandum Decision, at a prior hearing the court considered whether injunctive or declaratory relief could be sought as part of the confirmation process or, as the Commission, the State and others contended, required commencement of an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure. The court accepted Proponents' arguments that Rule 7001(7) authorizes obtaining an injunction or other equitable relief as part of a Chapter 11

plan, without the need for an adversary proceeding. The court's decision on that procedural point has not been reduced to an order to date but it can and will be dealt in any order approving a disclosure statement or any order confirming a plan of reorganization.

**28.** *See Mitchell v. Franchise Tax Board (In re Mitchell),* 222 B.R. 877 (9th Cir. BAP 1998), *aff'd,* 209 F.3d 1111 (9th Cir.2000).

sovereign immunity purposes. Fed. R. Bankr.P. 9014 deals with contested matters "not otherwise governed by [Federal Rules of Bankruptcy Procedure] wherein relief shall be requested by motion." There can be no question but that the attempt to obtain declaratory or injunctive relief through the Plan confirmation process is subject to a properly invoked sovereign immunity defense.

2. Most of Proponents' arguments regarding sovereign immunity are premised upon the notion that the requested relief is proper under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This court has joined countless others in relying on *Ex Parte Young* in holding that federal courts can take actions against state officials acting in their representative capacity if they are violating federal law. *See Pacific Gas and Electric Co. v. California Public Utils. Comm'n (In re Pacific Gas and Elec. Co.)*, 263 B.R. 306, 314 (Bankr.N.D.Cal.2001). With that principle as a starting point, Proponents would have the court believe that an injunction is proper because officials of the Commission or the State might violate federal law—an order confirming a plan of reorganization—sometime in the future.

The Ninth Circuit has held in *Goldberg v. Ellett (In re Ellett)*, 254 F.3d 1135 (9th Cir.2001), *petition for cert. filed,* 70 U.S.L.W. 3374 (U.S. Nov. 20, 2001), that discharge orders are binding on states notwithstanding their avoidance of bankruptcy court jurisdiction, whether or not the result would prevent a state from collecting monies otherwise owed to it. *Ellett,* 254 F.3d at 1141, *citing Mitchell,* 209 F.3d at 1117. Authorities from other circuits agree that there are no sovereign immunity implications when the bankruptcy court exercises jurisdiction over the *res* of the bankruptcy estate. *Texas v. Walker,* 142 F.3d 813 (5th Cir. 1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999); *State of Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir. 1997) (confirmation order not a suit against state; state not named as defendant or served with process mandating appearance; order confirming plan, including a provision interpreting Bankruptcy Code § 1146(c), derived not from jurisdiction over the estate or other creditors, but rather from the jurisdiction over debtors and their estates).[29] *See* Section 1141(a) (confirmed plan binds "any creditor", and Section 1142(a)) (debtor and " . . . any entity organized . . . for the purpose of carrying out the plan shall carry out the plan . . . .").

The Ninth Circuit visited the *Ex Parte Young* exception recently in *Duke Energy*

---

**29.** Lurking beneath the surface of the instant dispute is the intimation by Corporation's counsel that officials of the Commission or the State will simply take the position that they may ignore an order confirming a plan of reorganization, and thus they will be free to enforce state law based upon the inability of this court to grant *in rem* relief that preempts such state law. For example, he stated (without offering any evidence) that they will "impute" things when it comes to rate making. The cases cited in the text contrast an attempt to obtain affirmative relief from a sovereign with a bankruptcy court exercising traditional *in rem* jurisdiction over the debtor and its assets. That *in rem* jurisdiction is binding. Stated otherwise, if an order confirming the Plan, or any similar plan found to preempt specific state laws and regulations, is entered, the bankruptcy court must take the position that any attempt to circumvent the effectiveness of such an order will be met with an injunction as authorized under *Ex Parte Young*, just as occurred in *Ellett*. This bankruptcy court will do exactly that. Otherwise the integrity of the federal court and its order will be undermined. Thus counsel's warning that the state officials are "bound to take the plan seriously" is unquestioned.

*Trading and Marketing, LLC v. Davis*, 267 F.3d 1042 (9th Cir.2001). There again, as only a few weeks earlier in *Ellett,* the court upheld the ability of the trial court to enjoin a violation of federal law. Similarly, a threatened violation of federal law can be restrained as well. *Agua Caliente Band of Cahuilla Indians v. Hardin,* 223 F.3d 1041 (9th Cir.2000), *cert. denied,* 532 U.S. 958, 121 S.Ct. 1485, 149 L.Ed.2d 373 (2001).

The problem with their reliance on *Agua Caliente, Duke Energy, Ellett* and similar cases at the present time is that Proponents can point to no ongoing or threatened violation of federal law. They treat the opposition of the Commission and the State to approval of the Disclosure Statement (based upon sovereign immunity, preemption and numerous other grounds) as a presumed threat just as PG & E did when it sought to enjoin the Commission early in this case and was turned away, in part because it could not point to any actual or threatened violation of federal law. *See Pacific Gas and Elec.,* 263 B.R. at 323. Absent such a real threat or an ongoing violation, *Ex Parte Young* is not available to support injunctive relief through confirmation. Thus the Plan as drafted cannot overcome the sovereign immunity objection.

Finally, State and Commission argue that the Plan is so pervasive a threat to sovereign immunity that *Ex Parte Young* is not available based upon the exception found in *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). In view of the court's rejection of Proponents' wholesale express preemption theory and its refusal to apply an *Ex Parte Young* exception to the sovereign immunity defense at this time, it is unnecessary to reach this issue.

3. Proponents point to several instances of conduct during this Chapter 11 case that amount to a waiver of sovereign immunity by the Commission and the State. As noted in footnote 6, waiver of sovereign immunity was not an issue the court was willing to consider at the January 25, 2002 hearing. If Proponents believe that the provisions of the Plan seeking injunctive or declaratory relief can be justified because of a waiver of sovereign immunity, then the revised disclosure statement should state with specificity the facts suggesting such a waiver. The issue will be tried as part of confirmation.

## VI. *Disposition*

 This Memorandum Decision rejects outright Proponents' across-the-board, take-no-prisoners preemption strategy in the Plan and Disclosure Statement. If Proponents believe the court is in error, they are entitled to attempt to seek review on appeal. To that end, the court will, if requested, enter an order disapproving the Disclosure Statement (or the latest version of it) for the reasons stated herein. Approval of a disclosure statement is not a final order for purposes of appeal. *Everett v. Perez (In re Perez),* 30 F.3d 1209, 1217 (9th Cir.1994), *citing Texas Extrusion Corp. v. Lockheed Corp. (Matter of Texas Extrusion Corp.),* 844 F.2d 1142, 1154 (5th Cir.1988), *cert. denied,* 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988). Denial of approval of a disclosure statement is likewise interlocutory. *Asbestos Claimants v. Aetna Casualty & Surety Co. (In re The Wallace & Gale Co.),* 72 F.3d 21, 25 (4th Cir.1995) ("the bankruptcy court's order denying approval of the disclosure statement was interlocutory"), *citing Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.),* 960 F.2d 23, 26 (5th Cir.1992). Any appeal will be discretionary with the District Court or the Bankruptcy Appellate Panel (28 U.S.C. § 158(a)(3) & (b)) and the court will not impede Proponents if they wish to attempt

an appeal of an interlocutory order. In the alternative, the court will consider a proper request to certify the order disapproving the Disclosure Statement under Fed.R.Civ.P. 54(b), made applicable by Fed. R. Bankr.P. 7054(a) and Fed. R. Bankr.P. 9014.

Regardless of any decision about an appeal from this decision, the court and parties in interest need to know Proponents' intentions. Will they eliminate the provisions of the Plan and Disclosure Statement that implicate sovereign immunity? Will they amend the Plan to eliminate the express preemption provisions and amend the Disclosure Statement to meet their prima facie burden of disclosure and proceed to a confirmation hearing in an attempt to carry their burden to show implied preemption as the court recognizes as possible? Will they submit an alternative plan to replace the Plan and Disclosure Statement?

Apart from the foregoing—and unrelated to the merits of the court's decision here—the Commission has stated its intention to file its own plan of reorganization.[30] PG & E is entitled to respond to Commission's term sheet.

Accordingly, the following schedule will apply:

A. No later than February 21, 2002, PG & E is to:

1. File and serve its response to Commission's term sheet. The response is to be limited to twenty (20) pages.[31] If Commission does not file the term sheet by the February 13, 2002, deadline, PG & E's counsel may submit a declaration of non-compliance together with an order that will supplement the Exclusivity Order, terminating Commission's right to file a term sheet and extending all plan exclusivity until June 30, 2002.

2. File and serve a statement of its (and Corporation's) intentions as to the future of the plan and disclosure statement process in this Chapter 11 case, addressing the questions raised above.

3. Submit a form of order denying approval of the Disclosure Statement "for the reasons stated" in this Memorandum Decision if that is its desire.

4. File and serve any request for interlocutory certification of the order denying approval of the Disclosure Statement that it wishes to have this court enter.

B. The papers described in the foregoing paragraph A are to be served upon the United States Trustee, counsel for the Committee, and counsel for all parties who filed oppositions to PG & E's Motion For Order Further Extending Exclusivity Period For Plan Of Reorganization and/or any objections to the adequacy of the Disclosure Statement based upon preemption and sovereign immunity grounds.

---

**30.** On February 1, 2002, this court entered its Order Further Extending Exclusivity Period For Plan of Reorganization, and on February 3, 2002, its Amended Order Further Extending Exclusivity Period For Plan of Reorganization ("Exclusivity Order"). By that Exclusivity Order the court extended PG & E's exclusivity under Section 1121(c)(3) to June 30, 2002, except for the Commission. The Commission has until February 13, 2002, to file and serve a term sheet regarding its contemplated plan of reorganization, specifying (i) the proposed classification of all claims in

interest; (ii) the proposed treatment of all claims in interest; (iii) the proposed means for implementation of any such plan (including, without limitation, specifics how particular claims will be satisfied, reinstated or refinanced); and (iv) a time-line for proposing and seeking approval of the plan it contemplates.

**31.** The Committee may also file its response to the Commission's term sheet, subject to the same page limitations.

C. Any party who objected to the adequacy of the Disclosure Statement on the basis of preemption and sovereign immunity may present any opposition it has to any request PG & E may file in accordance with paragraph A.4 for certification of any order denying approval of the Disclosure Statement at the hearing mentioned below.

D. The court will conduct a hearing on February 27, 2002, at 1:30 P.M., to consider all matters addressed in the foregoing. No papers other than those requested are to be filed in connection with that hearing.